IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

4DD HOLDINGS, LLC,

*Plaintiff*,

v.

LEIDOS SMS, INC., f/k/a SYSTEMS MADE SIMPLE, INC.;
LOCKHEED MARTIN CORPORATION;
LEIDOS, INC.; and
LEIDOS HOLDINGS, INC.,

*Defendants*.

Case No.: 1:26-cv-03725

JURY TRIAL DEMANDED

# COMPLAINT

Plaintiff 4DD Holdings, LLC ("4DD" or "Plaintiff"), by and through its counsel, hereby alleges against Defendants Leidos SMS, Inc., formerly known as Systems Made Simple, Inc. ("SMS"), Lockheed Martin Corporation ("Lockheed") and Leidos, Inc. and Leidos Holdings, Inc. (collectively, "Leidos," and together with SMS and Lockheed, "Defendants") as follows:

## NATURE OF THE CASE

1. The Department of Defense ("DoD") and the Department of Veterans Affairs ("VA") needed their health records systems to share data. In 2013, Defendant SMS, the government's prime contractor, evaluated data federation products for the program. 4DD's TETRA platform earned the highest weighted score from a field culled down from a group that initially included products from IBM and SAP, and then beat the other finalist in a hands-on, head-to-head test that SMS designed and ran. In June 2013, SMS recommended that the government buy TETRA.

2. SMS was a services firm with no data federation product and no internal capability to build one. Its executives planned to sell the company and wanted a technology product to raise its value. In July 2013, without telling 4DD that SMS had already recommended TETRA to the government, SMS offered to buy 4DD for $40 million. 4DD declined the offer because it was significantly below market value and proposed a strategic partnership instead. In September 2013, the government bought TETRA by brand name on a sole-source basis.

3. Unable to buy 4DD, SMS set out to take TETRA through its partnership. To gain access to TETRA and 4DD's confidential technical materials, SMS signed written agreements that prohibited it from using 4DD's technology to build a competing product. SMS broke that promise and others. It purposefully circumvented 4DD's license enforcement mechanism, made thousands of TETRA copies beyond what the government had licensed, and knowingly under-reported the copies to the government and 4DD. The unpaid copies grew into a liability that the government had not budgeted for. SMS used 4DD's trade secrets to build a competing platform that SMS called eHIIP. On information and belief, SMS also stripped 4DD's marks from TETRA and demonstrated it to prospective business partners and acquirers as SMS's own product. In January 2015, SMS blamed 4DD, falsely telling the government that 4DD had agreed there would be no compensation for TETRA in SMS's lab environment.

4. TETRA also stood to play a part in a much larger program, DoD's multi-billion-dollar modernization of its legacy health records system. On August 27, 2014, Leidos and 4DD signed an exclusive teaming agreement. A week later, the government told SMS that the government would be "done with" TETRA. In October 2014, two weeks before proposals were due, Leidos dropped 4DD from its team, and Leidos went on to win the modernization contract.

SMS's conduct cost 4DD the government program that TETRA had won and its place on the winning team. That interference with 4DD's business relationships is at the center of this case.

5. Lockheed bought SMS on December 1, 2014, for $344 million, with ample reason to know the license dispute was unresolved, and then marketed eHIIP. In August 2016, Lockheed combined the business unit that held SMS with Leidos, and Leidos marketed eHIIP under its own name. On information and belief, Defendants have turned the capability derived from TETRA into approximately $1.4 billion in federal contract value. The Court of Federal Claims has already held the United States liable for the copying that the government authorized. This case is about what SMS did for itself, and what Lockheed and Leidos carried forward.

6. 4DD's federal claims arise under the Defend Trade Secrets Act, the Lanham Act, and the Copyright Act, and this Court has federal question jurisdiction over them. Its claims under Virginia law, which arise from the same facts, are for tortious interference with prospective business relations, trade secret misappropriation, unjust enrichment, and fraudulent inducement. 4DD seeks damages or, in the alternative, a reasonable royalty, and punitive or exemplary damages where the law permits. It also seeks a permanent injunction against any product or professional services that incorporate or derive from 4DD's trade secrets or technology, including eHIIP.

## PARTIES

7. Plaintiff 4DD Holdings, LLC (d/b/a 4DD Software) ("4DD") is a Delaware limited liability company. From 2013 to 2015, 4DD maintained its headquarters at 1600 Tysons Blvd., 8th Floor, McLean, Virginia. 4DD's four members are residents of North Carolina, South Carolina, and Maryland. 4DD is a veteran-owned small business that develops software products for licensing to government and commercial customers.

8. Defendant Leidos SMS, Inc., formerly known as Systems Made Simple, Inc. ("SMS"), is a New York corporation. In 2012 and 2013, its principal place of business was at 7900

Westpark Drive, Suite T-720, McLean, Virginia, and in 2014 it was at 8521 Leesburg Pike, Suite 600, Vienna, Virginia. SMS is now a subsidiary of Leidos with its principal place of business at 1750 Presidents Street, Reston, Virginia. Systems Made Simple, Inc. was incorporated in the state of New York in 1991 and amended its Certificate of Incorporation in 2021 to change its name to Leidos SMS, Inc.

9. Defendant Lockheed Martin Corporation ("Lockheed") is a Maryland corporation with its principal place of business at 6801 Rockledge Drive, Bethesda, Maryland. Lockheed owned and operated SMS as a wholly owned subsidiary from December 1, 2014, until 2016, when SMS was transferred to Leidos in the combination of Lockheed's Information Systems & Global Solutions ("IS&GS") business with Leidos.

10. Defendants Leidos Holdings, Inc. and Leidos, Inc. (together, "Leidos") are Delaware corporations with their principal place of business at 1750 Presidents Street, Reston, Virginia.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, 18 U.S.C. § 1836(c), and 15 U.S.C. § 1121(a), because 4DD's federal claims arise under the trade secret laws of the United States (18 U.S.C. § 1831 et seq.), the Lanham Act (15 U.S.C. § 1125(a)), and the copyright laws of the United States (17 U.S.C. § 101 et seq.).

12. This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative fact.

13. Defendants are subject to personal jurisdiction in this Court. Defendants regularly conduct business in Virginia, and a substantial part of the events giving rise to these claims

occurred in Virginia. Furthermore, Defendants' misappropriation of 4DD's trade secrets and other wrongful conduct caused tortious injury to 4DD in Virginia, where 4DD was headquartered.

14. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1400(a) because a substantial part of the events giving rise to this action occurred in Virginia. Additionally, venue is proper in this District because SMS and 4DD agreed that any legal disputes under the contracts that underlie their business relationship would be heard in courts located in Fairfax County, Virginia, or the United States District Court for the Eastern District of Virginia (Alexandria Division), and both Lockheed and Leidos assumed responsibility for those contracts when they acquired SMS as a wholly owned subsidiary.

## FACTS

### A. The Government's Need for a Data Federation Layer

15. The DoD and the VA entered the 2010s unable to give medical clinicians a complete medical record for service members and veterans, whose data sat in incompatible legacy systems. On February 5, 2013, after years of congressional mandates and Government Accountability Office criticism of their slow progress towards sharing health data, and amid cost and schedule concerns about their plan to replace those systems with a single integrated electronic health record ("iEHR"), the departments changed course and prioritized integrating their health data through interoperability and existing solutions. That decision required a data services layer capable of harmonizing data from disparate sources and presenting that data in standardized, computable formats.

16. The departments' Interagency Program Office ("IPO") had selected SMS as the lead contractor for the iEHR program, which the government renamed the Defense Medical Information Exchange ("DMIX"), and tasked SMS with identifying and implementing a data

federation solution. SMS was a professional services firm. It had no data federation product and no internal capability to build one, so the program depended on a proven commercial federator.

17. In early 2013, the IPO directed SMS to prepare a working prototype for an April 3-4, 2013 technical summit and to conduct an Analysis of Alternatives ("AoA") addressing whether to build or buy the core data federation capability for the program that, according to the AoA, would be expected to provide data management services for up to 75 to 100 years. At the April 2013 summit, SMS recommended "buy," citing the risk of developing a sufficiently robust data federator in-house and warning against "a lightweight design that we outgrow in a year." The government accepted that recommendation, and SMS delivered the build-or-buy AoA report to the government on May 3, 2013.

18. A separate Initial Down-Select AoA, which ran from February through June 2013, narrowed an initial field of potential providers that included Informatica, IBM, SAP, Oracle, Denodo, Composite, Information Builders iWay, InterSystems, and MarkLogic. The analysis credited 4DD's TETRA Platform as a "Dual-capability federator," with "Highly advanced caching," "High functionality, with almost all capabilities supported out of the box," and "Success within the VA Environment." The analysis also recorded that Composite "is incapable of supporting the iEHR end state," that IBM's suite was disqualified because "the IBM data federation products federate data by converting it to relational form," and that SAP lacked "extensive expertise in CDC and granular real-time data flow, data federation and message-oriented deployments." TETRA received the highest weighted score of any remaining alternative evaluated: 95; Information Builders iWay received 89, and the other five alternatives scored between 59 and 70.

**B. 4DD and TETRA**

19. Bennett McPhatter, Duane Epperly, and Hongda Lin founded 4DD in 2010, drawing on experience that each had developed since the 1990s in solving large and complex data management problems. 4DD was a product company from its inception. 4DD's flagship offering is the TETRA Platform, a full-stack data platform that 4DD has developed since 2010 to unify, normalize, and deliver data from disparate systems in real time without replacing those systems. A specialized implementation, the TETRA Healthcare Federator, applies those technologies to large-scale healthcare deployments.

20. 4DD proved TETRA in the field before TETRA reached DoD, automating telephone number deconfliction for the Washington/Baltimore High Intensity Drug Trafficking Areas ("HIDTA") program, which serves law enforcement agencies in Maryland, Virginia, and the District of Columbia, and for the Houston HIDTA Intelligence Support Center; harmonizing data across roughly 90 data sources for the North Central Texas Fusion Center; and supporting the Veterans Administration Chief Business Office Payer Relations Program.

21. 4DD also entered a reseller and strategic partnership with Thomson Reuters ("TR") for federal opportunities, whereby TETRA became a component of TR's data offerings for federal intelligence customers, giving 4DD a channel to government agencies.

**C. TETRA's Architecture, Trade Secrets, Copyright, and Mark**

22. TETRA unifies, normalizes, and delivers information from heterogeneous systems through application programming interfaces ("API"). TETRA's main services engine, TETRA Services, exposes the API that allows systems to interact. Its record-keeping module, TETRA Audit, maintains a history of every operation that the program executes. TETRA Studio is a graphical interface and programming tool that allows software engineers to enable the TETRA Healthcare Federator and instruct it how to function. Together these components support dynamic

retrieval, normalization, and presentation of healthcare data from multiple sources in real time. The architecture embodies confidential algorithms, data models, and orchestration logic that permit automated source selection, semantic normalization across medical coding systems, and association of related data items. 4DD developed those methods internally, never publicly disclosed them, and treats them as its trade secrets and highly confidential and proprietary information. TETRA's performance rested on 4DD's confidential approach to data processing, including TETRA's caching architecture.

23. 4DD owns trade secrets that are embodied in its TETRA data-federation platform, including: (a) non-public system architecture and deployment topology; (b) schema mappings and transformation rules enabling cross-system interoperability; (c) proprietary API endpoints and interface specifications; (d) integration know-how and performance tuning parameters; (e) data management algorithms and schema; (f) development methodologies; (g) user interface design synchronization; and (h) confidential pricing, licensing matrices, and technical documentation.

24. 4DD also owns trade secrets in TETRA's source code. 4DD never disclosed that source code to SMS. 4DD alleges on information and belief that SMS derived non-public information about TETRA's implementation from the object code and installations it received, by analysis of the software running in its own corporate lab and by the cloning of TETRA across its own systems, and did so by improper means and outside the scope of any license 4DD granted.

25. 4DD took reasonable measures to maintain the secrecy of information that it treated as confidential. It required every counterparty, and any party seeking a TETRA demonstration going beyond capability-level details, to execute confidentiality, non-disclosure, and license agreements before receiving access. Every disclosure to SMS going beyond non-confidential capability-level details was made under a written instrument. 4DD marked its deliverables

"Confidential & Proprietary," restricted source and object code to need-to-know personnel, used multifactor authentication and encryption on its repositories, and secured its development computers by methods used for classified material, including locked rooms, need-to-know access, and cryptographic transmission of sensitive materials. 4DD supplied SMS with compiled object code only, never with TETRA's source code. 4DD's public use of the TETRA mark is consistent with these measures: 4DD marked its deliverables with the mark to identify 4DD as their source, and separately restricted the non-public architecture, code, schema mappings, algorithms, and technical documentation under confidentiality legends and written agreements.

26. 4DD's trade secrets derive independent economic value from not being generally known or readily ascertainable. The government's evaluation, in which TETRA outscored competitors with far greater resources and offered the lowest total cost of ownership, corroborates that value. So do SMS's recommendation to buy rather than build a data federator, its $40 million offer for 4DD, and its description of TETRA as being central to its system. On information and belief, Defendants converted the capability derived from TETRA into approximately $1.4 billion in federal contract value.

27. 4DD authored the TETRA computer program as an original work of authorship, developed the program with 4DD's own personnel and resources, and owns all right, title, and interest in the program. No third party holds any interest that limits 4DD's ownership. 4DD holds U.S. Copyright Registration No. TX 8-022-949 on the TETRA computer program, with an effective date of registration of May 19, 2015.[1] The date of first publication of TETRA is June 1, 2010. The Court of Federal Claims found that 4DD owns a valid copyright on TETRA, based on the government's concession of that issue.

[1] Ex. A (Certificate of Registration, TX 8-022-949)

28. 4DD owns U.S. Trademark Registration No. 4532091 on the Principal Register for the word mark TETRA in International Class 9, registered May 20, 2014, covering computer software for the collection, editing, organizing, modifying, bookmarking, transmission, storage, and manipulation of data and information for building data workflow processes.[2] The registration is active and in force, is constructive notice of 4DD's claim of ownership, and is prima facie evidence of the mark's validity, of 4DD's ownership, and of 4DD's exclusive right to use the mark on the recited goods. 4DD first used the TETRA mark in commerce on April 1, 2010, and has used it continuously since. SMS also had actual notice of the TETRA mark: Addendum No. 2 to the Interim License Agreement, executed weeks after the registration issued, renders the mark as "TETRA®." The mark is a public designation of source.

**D. SMS Enlists 4DD for the iEHR Bid Under Written Confidentiality Agreements**

29. SMS and 4DD's relationship began in June 2012, when SMS sought 4DD's help with the technical proposal for SMS's bid to become the prime contractor on the iEHR program. Todd Schwartzrock of SMS specifically engaged 4DD to discuss opportunities relating to the "Chief Information Officer - Solutions and Partners 3 (CIO-SP3)," a series of contract opportunities that included iEHR. During that initial period, including at 4DD's August 15, 2012 demonstration to SMS, 4DD' described what TETRA could do for the iEHR effort but did not disclose non-public details of how TETRA worked.

30. On September 11, 2012, 4DD and SMS entered into a teaming agreement for the iEHR contract. That written instrument marked the point at which contractual confidentiality

[2] Ex. B (U.S. Trademark Reg. No. 4,532,091)

protections attached to the parties' exchanges.[3] With those protections in place, 4DD engaged in capability-focused technical discussions with SMS at the request of SMS's Scott Warnick.

31. After winning the iEHR contract with 4DD's technical support, SMS entered into a Master Subcontract Agreement and Subcontract Task Order with 4DD on October 25, 2012, which included confidentiality obligations binding SMS. Two 4DD personnel worked on the project as a business analyst and a database architect. Internally, SMS referred to 4DD's TETRA software as being central to its solution on this project.

**E. TETRA Prevails in the Government's Evaluation**

32. The prototype schedule described in Section A was a product of the February 5, 2013 announcement by DoD and the VA that they would change their plan for a single, jointly built health record and instead make their existing systems interoperable. That shift put data federation at the center of the program and left SMS just under two months to show a working federator at the April 3-4, 2013 summit. SMS relied on TETRA for its summit demonstration, which was executed without issues, according to SMS's iEHR project manager, Robert Matus. Months later, the chief executive of MITRE, the federally funded research and development center consulting on the project with the Defense Health Agency ("DHA") and the VA, referred to TETRA as a highlight of SMS's approach and on information and belief discussed TETRA regularly with Under Secretary of Defense for Acquisition, Technology, and Logistics Frank Kendall.

33. After the April 2013 summit, SMS evaluated an initial panel of ten potential vendors, including 4DD, to determine the best commercial off-the-shelf data federator. TETRA

---

[3] 4DD will rely on additional agreements in its possession regarding confidentiality obligations owed by SMS to 4DD.

received the highest weighted score against the AoA competitors, landed 566 of 570 on the iEHR's functional requirements, and secured a perfect 400 of 400 on its non-functional and performance requirements.

34. TETRA was one of two finalists in a two-week, hands-on "data federation vendor fly-off," a head-to-head test of the finalists' software in a simulation of the government's interoperability environment. To prepare for the fly-off, 4DD provided SMS with TETRA software downloads and technical documentation, including installation guides, and SMS requested demonstrations and hands-on training for its developers. Testing against the government's scenarios began June 11, 2013. SMS designed the scenarios, administered the fly-off, and observed the testing throughout, with IPO representation present, and SMS submitted the results to the government on June 21, 2013.

35. Dave Calvin, the government's Chief Engineer and Contracting Officer's Representative on the iEHR project, asked SMS to obtain pricing from the panel members so that the government could set aside funding for the data federator. The resulting exercise used a per-site methodology that placed TETRA at every medical site within the military health system. As McPhatter explained 4DD's figures to SMS on December 10, 2013, 4DD's pricing followed averages of about $3,000,000.00 per hospital, anticipating 150 hospitals. That exercise priced TETRA for deployment across the military health system as a whole and was a different scope from the per-processor-core pricing of the government's September 26, 2013 delivery order to 4DD's authorized reseller, Immix Technology, Inc. (Award No. HT0012-13-C-0010), described in Section H.

### F. SMS Needed a Product to Sell Itself

36. SMS built its federal business as a services contractor that competed for work as a small business. In January 2014, SMS told a federal agency that it was a NITAAC CIO-SP3 small

business contract awardee in all 10 functional task areas of the GWAC, and as late as October 2014 its CEO described SMS as a service-disabled, veteran-owned prime contractor.

37. SMS was outgrowing that status. In an October 2, 2014 interview, SMS's CEO, Ron Fishbeck, said: "Since last year, our organization has been making the transformation from a small business into a large business. We have added more than 200 employees to our staff in that time, and our business base has again doubled." On information and belief, SMS's owners expected by 2013 that continued growth would carry SMS beyond the small-business preferences that had supported its government business, and they planned to sell the company to a larger contractor.

38. SMS's leadership knew that SMS had no product to sell. At an October 2013 retreat, SMS's Board of Directors was told that "[t]oday, SMS positions as a health IT, application development services firm for the federal government," and was presented with a "strategic investment" opportunity built on 4DD's software. On information and belief, SMS's owners believed that a buyer would pay substantially more for SMS if SMS owned a healthcare technology product rather than only services contracts.

39. SMS also knew that it could not quickly build such a product itself. In the build-or-buy analysis that SMS prepared for the IPO in the spring of 2013, SMS wrote that "[a] market-proven data federation product takes tens of thousands of person hours to develop and test (30,000 for the Tetra platform from 4DD Software) and seems almost reckless not to take advantage of that development effort and try to write lightweight versions of the same functionality in a very short time." SMS recommended that the government buy a commercial product because "[t]he lightweight alternatives simply take too long and involve too much risk to be seriously considered."

40. By the summer of 2013, SMS had watched TETRA succeed at every stage. SMS saw 4DD demonstrate TETRA in August 2012. In the Analysis of Alternatives that SMS prepared, TETRA received the highest weighted score of any alternative. SMS designed and ran the fly-off that TETRA won, recommended that the government buy TETRA, and characterized TETRA as being central to its system.

**G. SMS Offers to Buy 4DD and Seeks Early Use of TETRA**

41. On June 25, 2013, four days after the fly-off results were submitted, 'Fishbeck asked McPhatter to meet with him and SMS's President, Al Nardslico, to discuss opportunities for developing a business relationship outside of the IPO context. At the July 24, 2013 meeting, Fishbeck and Nardslico told McPhatter that they planned to sell SMS within two to four years and that SMS, a services company, wanted to add technology products to increase its valuation. Having watched TETRA perform in the fly-off, they offered to buy 4DD for $40 million. McPhatter declined the offer because it was below 4DD's market value and proposed instead a strategic partnership under which the parties would develop coordinated software based on TETRA, market that software jointly to SMS's government healthcare customers, and share the revenue. The SMS executives responded favorably.

42. When 4DD declined to sell, SMS set out to obtain through a partnership what it had offered to buy. On December 19, 2013, Fishbeck signed for SMS a Letter of Intent under which the parties would develop products built to be used in conjunction with 4DD's proprietary technologies, including TETRA™ Platform, and joint project software that would be designed to be used solely in coordination and combination with the TETRA Platform by means of the 4DD API.

43. Fewer than 24 hours after SMS made its offer to purchase 4DD, 4DD learned that the government had selected 4DD as the winner of the iEHR fly-off, based on SMS's June 2013

recommendation. When Fishbeck and Nardslico made their offer, they knew that SMS had recommended that the government procure TETRA as soon as possible, and they withheld that information from 4DD. Afterward, Warnick referred to TETRA as being central to SMS's system.

44. Even before the announcement that 4DD had won the fly-off, SMS asked to move forward with TETRA in its Development and Integration environments. On or about July 17, 2013, SMS software engineer Chris Weicht wrote to 4DD that SMS wanted to use evaluation licenses to get into the DTC, expecting that one or two months would pass before the IPO made a purchase decision. SMS recorded that it would move forward with TETRA until that decision. 4DD agreed to that limited use on the understanding that the copies used during that period were loaner versions that would be paid for out of the original 64-core purchase.

45. After the IPO selected 4DD as the data federator, TRICARE made an initial purchase of TETRA, with plans to purchase additional licenses and use TETRA in two production locations by the end of 2013. On September 30, 2013, SMS gave an integration demonstration that Calvin said he was happy with and that gave SMS another opportunity to observe TETRA in action without any involvement or oversight from 4DD.

46. In July 2013 congressional testimony, DoD and VA committed to a near-term, standards-based "data management service" that would give clinicians an integrated view of patient data by the beginning of 2014, while longer-term modernization proceeded in parallel through a full and open competition for the Defense Healthcare Management Systems Modernization ("DHMSM") program, coordinated with the iEHR and DMIX integration framework. Those commitments described the role that TETRA was selected to perform, set milestones for 2014 through 2016, and placed the program on a funded footing rather than an evaluative one.

47. Separately, on or about September 27, 2013, SMS's team, including 4DD, won the iEHR year-two recompete under award HT0012-13-F-0006. The parties' teaming agreement for that recompete, effective May 16, 2013 and executed by 4DD on May 23, 2013, governed the parties' exchanges when SMS sought access to TETRA for the fly-off and the evaluation that followed. That agreement provided for an exclusive arrangement with projected workshare allocations and bound SMS to strictly protect 4DD's confidential information and not use or disclose such' information except for the purpose of performing the Agreement. That recompete concerned the systems integration services contract on which SMS was the prime contractor and 4DD was a subcontractor. The recompete did not govern the government's independent acquisition of TETRA.

48. In the fall of 2013, SMS conducted an output performance test to confirm TETRA's scalability in a production-representative environment. The minimum passing threshold was 30,000 transactions per hour, with a perfect score set at 60,000. TETRA's measured throughput exceeded 900,000 transactions per hour. During congressional outreach that TR helped organize in late 2013, 4DD informed Congress that 4DD could supply TETRA at a discounted price of approximately $450 million if the government committed to a bulk purchase rather than smaller, incremental acquisitions.

## H. The Government Buys TETRA by Brand Name on a Sole-Source Basis

49. On information and belief, in or around August 2013, the government executed a Brand Name Justification and Approval under Federal Acquisition Regulation ("FAR") 6.302-1, a justification for a sole-source acquisition rather than full and open competition. The government cited the same authority in its published award notice.

50. In September 2013, the government acquired production licenses for 64 processor cores of the TETRA Healthcare Federator and 50 TETRA Studio seats from 4DD through Immix

Technology, Inc., 4DD's authorized reseller, under Immix's NASA Solutions for Enterprise-Wide Procurement ("SEWP") contract, Contract No. NNG07DA20B. On September 26, 2013, the government agreed to a firm-fixed-price delivery order with Immix, Award No. HT0012-13-C-0010, for $860,870.01. Every product, maintenance, training, and support line item is designated "BRAND NAME/SOLE SOURCE: BN." The government executed an End User License Agreement ("EULA") in or around September 2013, which imposed conditions on TETRA's use, and Immix issued its own purchase order to 4DD as manufacturer, PO No. IM60212, for $831,303.05, with a one-year base period and four option years.

51. A written reseller agreement granted Immix a non-exclusive license to resell TETRA to government customers on 4DD's behalf and obligated Immix to collect license fees for all licenses procured. The Court of Federal Claims later found that Immix was an authorized reseller of TETRA for 4DD. SMS, as prime contractor for the government, worked with DoD to deploy TETRA on SMS and government machines; as 4DD's records reflect, "TETRA is installed in both the SMS integration platform and the government data and test center environments."

52. On October 7, 2013, the federal System for Award Management website, SAM.gov, published an award notice for Solicitation No. HT0012-13-R-0019 reporting Award No. HT0012-13-C-0010 for a base year plus four option years. The notice states: "The action is award of a firm-fixed-price delivery order for 4DD Tetra Health Care Federator Licenses and maintenance and technical support under the authority of FAR 6.302-1 'Only One Responsible Source and No Other Supplies or Services Will Satisfy Agency Requirement' and citing 41 U.S.C. § 253(c)(5)." The base period included a $668,582.83 license for 64 Federator cores and a $166,830.62 license for 50 Studio Enterprise seats.

53. The delivery order also priced the license's growth. For each of Option Years 1, 2, and 3, it includes contract line items ("CLINs") for a 32-core TETRA Health Care Federator production license with maintenance at $334,291.52 (CLINs 1001, 2001, and 3001) and for a 10-seat TETRA Studio Enterprise license at $33,366.10 (CLINs 1002, 2002, and 3002). Option Year 4 provides maintenance through September 25, 2018. If fully exercised, the order would grow from 64 processor cores to 160 and from 50 Studio seats to 80. The September 2013 acquisition was not a one-time purchase, but instead a ramp toward enterprise deployment. The award reflected discounts from 4DD's list pricing. In the December 10, 2013 communication to SMS described above, McPhatter said that 4DD's figures reflected the steepest discounts 4DD had ever offered, with processor core licenses at about $6,000.00 rather than the list price of $24,000.00. McPhatter explained that the discounts were offered with the expectation that the government would make a bulk purchase in the near term, and that if the government purchased in smaller increments, the discount would be affected. On information and belief, the award also came in far below the government's own independent estimate over the full term.

54. Apart from Option Year 1 (September 26, 2014 – September 25, 2015) and its March 2015 modification of CLIN 1001 to pay for 168 additional cores at the original contract price, the government exercised none of the priced option years. The delivery order priced development and initial production together with an annual growth mechanism. Enterprise-wide deployment across the military health system, which had been separately priced on a per-site basis, would not have been acquired through the delivery order.

## I. SMS Seeks Deeper Access to TETRA Under Written Confidentiality Agreements

55. Apart from the prime-subcontractor relationship, SMS sought continued access to TETRA under further written agreements while the parties negotiated a definitive strategic partnership agreement. At an October 2013 SMS Board of Directors retreat, SMS Executive Vice

President Bob Sheahan presented a "strategic investment" opportunity with 4DD's software, explaining that "[t]oday, SMS positions as a health IT, application development services firm for the federal government" and that SMS and 4DD had "complementary" capabilities. SMS presented itself as a services firm seeking a product partner while, on information and belief, its senior leadership planned to rebrand TETRA, clone its functionality, and position a fake TETRA as SMS's own platform.

56. 4DD and SMS executed an NDA on November 5, 2013 (the "Strategic Partnership NDA") and a Letter of Intent on December 19, 2013. Both agreements bound SMS to maintain in confidence 4DD's confidential and proprietary information and not use it for any purpose other than evaluating opportunities with 4DD.

57. The Letter of Intent also provided that the parties would evaluate the potential for developing coordinated software. Every form of branding that the parties executed kept the TETRA mark visible as a designator of source, and any arrangement deviating from that standard was to be fixed in a Definitive Agreement that was never executed. The unexecuted draft agreement that 4DD's counsel circulated on January 22, 2014, likewise contemplated "labeling of Coordinated Software as 'Powered by Tetra®'" and provided that "any and all uses by SMS of the 4DD Brand shall be subject to the prior written approval of 4DD," and, as early as July 18, 2012, McPhatter had offered SMS a "'Powered by Tetra' in the About Box." 4DD offered to share billing with SMS and never entered any agreement to surrender identification of 4DD as the source of TETRA.

58. From November 2013 through September 2014, during the period governed by the Strategic Partnership NDA, the Letter of Intent, and the Interim License Agreement and its Addenda, SMS technology team members repeatedly requested information about TETRA, which

4DD supplied based on its understanding that the parties would build coordinated software on top of TETRA. 4DD personnel explained to SMS employees in considerable detail how they had built TETRA and how it operated, and SMS pressed 4DD for information about 4DD's future plans for TETRA and TETRA's next generation. SMS also sought a temporary evaluation agreement for further performance testing, even though SMS had already observed TETRA's performance in the iEHR testing.

59. In January 2014, the parties agreed to install TETRA on SMS's own computers as part of their mutual progress toward a definitive agreement, and they executed the Interim License Agreement on January 9, 2014. The license was narrow and specific, permitting SMS "to use internally, execute and display" 4DD's "Technology" solely on computer terminals in specified locations and "solely for purposes of validating the performance metrics of the Technology in connection with the anticipated development of the Coordinated Software under the Definitive Agreement," and to create a limited demonstration product for a February 2014 HIMSS conference, described below. The license prohibited SMS from using the Technology for any other purpose, from adapting, altering, modifying, or translating it, and from creating derivative works of it.

60. SMS obtained the Interim License Agreement by stating why it wanted the license. The agreement, which Fishbeck signed for SMS on January 9, 2014, provided that SMS desired to obtain a license to use 4DD's' technology solely for purposes of working on the development of joint project software in parallel with negotiating a definitive agreement and for purposes of validating various performance metrics of 4DD's technology, and to create a demonstration product to inter-operate with SMS's technology to be displayed at the February 2014 HIMSS

conference. Its purpose was to enable SMS to determine whether it desired to license 4DD's technology for SMS's business purposes.

61. 4DD charged nothing for the license. The agreement provided that no license fees or other fees would be payable under the agreement, and SMS agreed that the fee arrangement was made in consideration for the mutual covenants in the agreement. The agreement also required that each SMS employee given access to TETRA be approved in writing by McPhatter and by Bob Sheahan, SMS's' Executive Vice President.

62. SMS's statement of its purpose was false when made. On information and belief, when Fishbeck signed the Interim License Agreement, SMS's' leadership intended to use SMS's' access to TETRA and to 4DD's technical staff to build a data federation capability of SMS's own, which SMS could present to buyers and to the government as SMS's' product, and did not intend to confine its use of TETRA to evaluation and to joint project software built on TETRA, or to its demonstration product for the HIMSS conference. The basis for that belief includes SMS's plan to sell itself and its need for a product; SMS's' own estimate of what building a federator would take; the January 6, 2014 plan by SMS's John Reeher, three days before the agreement, to configure a single machine and then set up a template for faster deployment of TETRA; the requests SMS's architects made within weeks of the license; and what SMS did afterward.

63. 4DD remotely installed TETRA into the SMS Corporate Lab on January 10, 2014. Before the install, SMS's John Reeher asked 4DD how many machines to prepare, explaining that SMS would configure one machine where he would set up a template for fast, repeat deployments. On information and belief, SMS planned from the outset to replicate the installation across its systems, built that cloning template, and used the template to deploy TETRA within its own corporate environment for the partnership evaluation. On information and belief, no government

contract, task order, or direction called for this installation, which SMS undertook under the Interim License Agreement rather than for the DMIX project.

64. Regarding the limited demonstration product, the Interim License Agreement specifically allowed SMS "to access and use 4DD's Software Development Kit, including 4DD's proprietary application programming interface . . . for the Technology internally solely for purposes of creating a demonstration product which inter-operates with SMS' own technology" to be exhibited at the Healthcare Information and Management Systems Society ("HIMSS") Conference from February 23 through February 27, 2014. That grant did not authorize SMS to remove 4DD's marks from 4DD's software or materials, or to present 4DD's software to the industry as a product of SMS's own origin. On information and belief, SMS nonetheless exhibited TETRA-powered software to industry leaders in or around late 2014 under its own branding, with 4DD's marks removed.

65. With the software installed, 4DD continued to provide SMS confidential material, including documentation explaining how TETRA could be applied to healthcare delivery, documents detailing TETRA's capabilities, access to 4DD's support site with its help files, documentation, videos, and downloads, and sample data packages demonstrating TETRA services and TETRA Snap installed on an SMS virtual machine. SMS's Vice President of Capture and Proposals thanked 4DD on January 15, 2014 for giving him more information about TETRA, and SMS professed continued interest in the partnership throughout. In a January 29, 2014 meeting, Fishbeck, McPhatter, and Paul Kodack—SMS's Head of Contracts, Compliance, and Deal Pursuit—worked together on the definitive agreement.

66. On February 10, 2014, Matt Jenks, SMS's Chief Systems Architect, pressed Duane Epperly, then 4DD's Chief Operating Officer, for technical information that he lacked, explaining

that he needed it both for his internal work at SMS and for the iEHR project. On February 20, 2014, McPhatter shared with Jenks TETRA's draft roadmap, labeled on each page "Confidential & Proprietary." On March 14, 2014, three days before SMS signed the first extension of the Interim License Agreement, SMS Systems Architect Jeffrey Ting told 4DD that he was researching TETRA and asked how to perform TETRA functions that he could not figure out from the documentation. After the January 10, 2014 installation, SMS technical personnel, including Ron Fishbeck, Robert "Bob" Sax, Ezra Oyer, Dr. Viet Nguyen, Daniel Ramunda, Matt Jenks, Scott Warnick, Jeffrey Ting, and Todd Schwartzrock, had daily access to and interaction with TETRA. Fishbeck, SMS's chief executive officer, and several of these same individuals later filed the eHIIP patent application.

67. The parties twice extended the Interim License Agreement. Addendum No. 1, which Kodack signed for SMS on March 17, 2014, extended the term to May 31, 2014, and confirmed that the Letter of Intent would govern the exchange of confidential information. It provided that the extension was to allow SMS to further validate and test 4DD's technology and to continue in good faith to move toward the negotiation of a definitive agreement.

68. By the time Kodack signed Addendum No. 1, SMS's technical staff had been gathering what they would need to build SMS's own product, as Jenks's February 10 request for technical information, the February 20 transmission of TETRA's confidential roadmap, and Ting's March 14 resumption of his TETRA research show. On information and belief, when SMS signed Addendum No. 1, it did not intend to use the extension for validation, testing, or good-faith negotiation, but to continue gathering TETRA information for SMS's own product.

69. SMS's agreements barred it from using TETRA for anything but evaluation and joint project software built on TETRA, and an interest in developing products of SMS's own was

consistent with the partnership the parties were negotiating, which contemplated SMS-branded products built on TETRA. 4DD therefore continued to deal with SMS as a partner. It countersigned the Letter of Intent on May 16, 2014, and completed a second TETRA install into SMS's labs on June 2, 2014.

70. Fishbeck signed Addendum No. 2 for SMS on June 16, 2014, its effective date, and 4DD countersigned it on June 18, 2014. Addendum No. 2 extended the term to September 1, 2014, added "TETRA 3.x," a release 4DD had recently developed, to the licensed Technology, again recited that the changes would allow the parties to continue in good faith to move toward the negotiation of a definitive agreement, made the confidentiality provisions of the Letter of Intent and Section 4 of the Interim License Agreement the governing terms for all exchanges of Confidential Information, gave 4DD the right to injunctive relief without bond on breach, and added an unqualified prohibition on competitive development:

> "[D]espite the prior existence of the NDA, the terms of Section 4 (Confidentiality Rights and Obligations) of the [Interim License] Agreement and of Section 8 (Confidentiality) of the [Letter of Intent], as amended by this Addendum No. 2, shall be deemed to supersede and govern any and all exchanges of Confidential Information (as defined in the LOI) between them during the Term of the Agreement, as the foregoing is extended by this Addendum No. 2. In the event of a breach of the Agreement, 4DD shall be entitled to injunctive relief, without the requirement of posting a bond, in addition to any other remedies available at law or in equity. In no event shall SMS use the Technology to develop a competitive product."

71. On information and belief, SMS made that promise while its leadership was developing a competing product and with no intention of keeping it. Todd Schwartzrock, SMS's'' CIO-SP3 Program Manager during 2014, later told McPhatter that SMS had been trying to build its own TETRA during this period and that Fishbeck had taken up that effort as a personal mission.

72. 4DD continued to deal with SMS as a partner after Addendum No. 2. On July 14, 2014, 4DD met with Sheahan, a meeting that led to plans for a further meeting on "4DD involvement in execution and strategy of TETRA."

**J. DMIX Becomes the Foundation for DHMSM, and Leidos Recruits 4DD**

73. On January 2, 2014, Under Secretary Kendall executed an Acquisition Decision Memorandum that moved the iEHR work out of the IPO and into DoD. Around that time, the government renamed the program DMIX. DMIX inherited by directive the government's mission to deliver near-term health data interoperability, which Congress had demanded and the Secretary of Defense directed be pursued through data federation, presentation, and interoperability, and DoD budgeted tens of millions of dollars per year for that mission. The data federation requirement that TETRA answered carried forward into DMIX.

74. Under DHMSM, a 10-year solicitation, DoD intended to replace its legacy health records system with a commercial off-the-shelf electronic health record; DoD later valued the resulting award at approximately $4.3 billion. DMIX was to serve as the data intermediary between legacy data stores and DHMSM. The government's DMIX Systems Engineering Plan stated that "[i]n the interim, DMIX will serve as the interoperable data exchange to facilitate transition to modernized systems," and its budget submissions describe DMIX as managing the data exchange from legacy data stores to prepare for the transition to the electronic health record being acquired through DHMSM. The government's architecture therefore required the successful DMIX federator to supply the data mediation layer for DHMSM integration, meaning that the winning DMIX product would necessarily be embedded in the DHMSM technical architecture and positioned as the interoperability standard for that multi-billion-dollar program.

75. At a June 2014 DHMSM Industry Day, the government described the DMIX mission as providing the "FOUNDATION to fully align with DHMSM," and DHA leaders told

industry participants that DMIX had to be fully operational before DHMSM could deploy. Patrick Truxillo, 4DD's Vice President of Business Development, summarized afterward that the consensus of the whole DHA team was that DMIX had to be completely operational before DHMSM's deployment. On information and belief, the DMIX business case made completion of DMIX a gate for the DHMSM award, requiring that all clinical and business health data domains be tested and implemented before that award, and recorded a lifecycle cost estimate for DMIX exceeding one billion dollars through fiscal year 2030. TETRA was the only data federator that the government had purchased and performance-tested on DMIX, and, on information and belief, had TETRA's production continued', the government would have deployed TETRA in the environments that DHMSM would draw on. TETRA's proven performance in connection with DMIX therefore supported a reasonable expectation that TETRA would supply the data mediation layer on which DHMSM integration depended.

76. At the February 2014 HIMSS Conference, Truxillo met Douglas Barton, Leidos's then-Chief Technology Officer. On information and belief, Barton saw TETRA identified in the draft DHMSM Request for Proposal ("RFP") materials and invited 4DD to join Leidos's bid team. 4DD and Leidos executed a nondisclosure agreement on March 3, 2014. Over the following months, Leidos pursued 4DD for its DHMSM response because TETRA was named in the government's procurement documents and had prevailed in the government's own evaluation of competing products, and the two companies discussed in detail TETRA's capabilities, its data federation role on DMIX, and how TETRA would strengthen Leidos's DHMSM response. The United States later told the Federal Circuit that "SMS excluded the products offered by IBM, SAP, and Oracle because of 'high price' and 'high cost' perceptions" and that "SMS selected 4DD as the 'fly-off winner' with '[c]ost of ownership [as] the most significant factor.'" Br. for the United

States at 5, *4DD Holdings, LLC v. United States*, No. 24-1996 (Fed. Cir. Jan. 14, 2025), ECF No. 27.

77. On August 27, 2014, Leidos and 4DD executed a teaming agreement effective August 20, 2014. The agreement contained an exclusivity clause, which precluded 4DD from joining any other DHMSM bidding consortium during the agreement term, but did not guarantee 4DD any workshare. Leidos's statement of work positioned TETRA for "Data Interoperability," "Legacy Data Sharing Transition," and "TETRA® product development, support and delivery." On information and belief, Leidos, a major defense contractor and the eventual DHMSM awardee, required 4DD's exclusive participation because Leidos expected TETRA to be deployed across the program.

78. On August 28, 2014, the government released the DMIX solicitation, which stated that "[n]ew components under development for future integration include a Data management Service based on TETRA." The next day, Schwartzrock, SMS's CIO-SP3 Program Manager, wrote to McPhatter, Truxillo, Sheahan, and others that no product other than TETRA was mentioned in the statement of work requirement, which set their team apart from others.

**K. SMS Exceeds the TETRA License**

79. 4DD did not know the full extent to which SMS was copying 4DD's software on the DMIX project. At the government's request, 4DD had disabled TETRA's tracking feature and relied on the government and its contractors to report TETRA usage accurately. The only check on that reporting was a license portal that recorded downloads; it did not capture copies made after a download.

80. SMS's software development lifecycle, which SMS designed and ran for the DMIX project, made copying TETRA a routine activity. SMS engineers first wrote and tested code packages adapting TETRA to the government's databases in SMS's own laboratories, using virtual

machines. SMS then released the packages that passed testing to the government's Development and Test Center ("DTC") for further testing and securing. One of the principal ways SMS made its copies was by "cloning," in which, rather than installing TETRA from 4DD, which would have required a license key from 4DD for each installation, SMS duplicated entire virtual machine images on which TETRA was already installed and keyed. Each clone was a complete, functioning copy of TETRA that carried the original license key, so a single licensed installation could be multiplied across any number of servers and environments without 4DD's knowledge and without payment. In effect, SMS's cloning circumvented TETRA's built-in license enforcement mechanism.

81. As a result, SMS regularly exceeded the license. The government's EULA permitted 64 cores and a single backup copy, and otherwise forbade copying. Yet SMS cloned virtual machines containing TETRA, routinely backed up those machines, and made new copies each time it released a code package to the DTC, creating thousands of unauthorized copies. SMS did this knowing that the licenses SMS had installed were supposed to come out of the government purchase.

82. Beginning in February 2014, 4DD exchanged license accountings with SMS and flagged that additional TETRA cores appeared to be in use. In May and July 2014, 4DD corresponded with SMS about license reporting and the status of SMS's core audit, and in August 2014, 4DD identified a small number of excess cores to the government, unaware of the sheer magnitude of unauthorized copies SMS had already made. 4DD's inquiries led to a formal license "true-up" that started in or around September 2014 and lasted through the early part of the following year. The true-up's purpose was to locate and pay for every TETRA copy.

83. SMS knew, or should have known, far more than 4DD about how many copies existed. The government chose SMS as lead contractor and tasked it with identifying and implementing the DMIX data federation solution. SMS performed much of that work in its own laboratories, conducted testing in the DTC' remotely, and sought the government's direction when it believed its use of TETRA would exceed the license. SMS reported TETRA activity to the government at regular intervals and, when asked, accounted for the TETRA activity in environments it operated. And as prime contractor, SMS had a contractual duty to manage Government Furnished Equipment, including TETRA, and to report its TETRA usage accurately.

84. However, when SMS reported TETRA activity to the government, it did so in general terms. On information and belief, the installation data SMS supplied, including during the true-up, intentionally omitted significant counts of copying, including cloned copies that SMS knew existed. The government admitted that it approved of SMS's method of virtual machine copying. But SMS's reporting and accounting left the government without knowledge of exactly how widespread the usage was and contributed to the accrual of an unbudgeted liability.

85. SMS also repeatedly recommended that the government delete excessive TETRA copies in the government's environment. On March 7, 2014, for example, SMS's Deputy Project Director William "Chip" Eubank reported to Calvin that "DFA software was cloned and moved," noted that "[t]his should not have happened," and asked whether to "Delete, Leave or Reimage[.]" *4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 123 (2019). Calvin responded, "I would say delete at this point." *Id.* at 124. On May 20, 2014, when Calvin asked SMS's project manager, Matus, whether the government had enough TETRA licenses to cover testing, Matus responded that the DTC had "the same licenses in multiple environments," that is, cloned copies of TETRA carrying a single license key, and that "[t]hose TETRA instances really need to be deleted." *Id.* By

May 2014, then, SMS knew that TETRA had been cloned across DTC environments beyond the licensed installations, and the government was relying on SMS for information about whether its licenses were sufficient. On July 31, 2014, Eubank admitted the government had deleted cloned copies of TETRA per Eubank's own recommendation.

86. Beginning in August 2014, in connection with the DMIX recompete, SMS required its employees to execute Organizational Conflict of Interest ("OCI") agreements, mandated by federal procurement regulations, that obligated them to treat subcontractor information, including 4DD's trade secrets, as restricted data subject to separation and need-to-know controls, and to use it only to perform the DMIX contract. With that notice, SMS nonetheless gave access to 4DD's technology outside those limits and used 4DD's information for purposes beyond the DMIX contract, including developing and marketing a competing product and preparing reports to the government during the true-up that understated TETRA installations.

### L. The Government and Leidos Turn Away From TETRA

87. On September 3, 2014, shortly after 4DD sought payment for additional cores the government had installed, DHA told SMS that "[t]here will be no data integration engine" and that DoD would be "done with" TETRA after purchasing licenses for one more year. ''On information and belief, the government's pivot away from TETRA was a result of the unbudgeted liability that accrued from its and SMS's past TETRA consumption, which SMS's reporting inaccurately quantified.

88. On information and belief, on September 18, 2014, Eubank told McPhatter, Truxillo, and David Janet that SMS would be removed from the contract if 4DD counted licenses using the methodology supported by the EULA. On information and belief, in or around October 2014, SMS delivered to the government a DMIX presentation advocating that the government move away from TETRA. Just weeks earlier, the most recent DMIX question-and-answer

materials had identified TETRA as the "prime tool" for the contractor to "maintain the mediated environment."

89. On October 2, 2014, WashingtonExec published an interview in which Fishbeck, whose services company had no software product offerings, said: "Moving forward, [SMS] look[s] to be at the forefront of the data interoperability movement based on the current work we are doing for the [Defense Health Agency] as well as our own internal R&D in this area," and "[t]he company that masters data interoperability will be at the forefront of the healthcare IT marketplace and we plan to be that company." Fishbeck's statement described the role of TETRA, and SMS thus became a direct competitor.

90. On October 16, 2014, about two weeks before DHMSM proposals were due and less than two months after executing the teaming agreement, Leidos terminated the teaming agreement by a letter stating that it was ending the agreement because of the OCI. That explanation does not withstand scrutiny: 4DD's inclusion in the draft DHMSM RFP materials had prompted Leidos's chief technology officer to invite 4DD onto the team, and, absent some information from SMS or the government, nothing about 4DD's position had changed. On information and belief, the actual reason was that the government had abandoned TETRA as the DMIX federator because of the unbudgeted liability that SMS's under-reporting left behind, and Leidos, recognizing that TETRA would no longer be included in the modernization effort for DHA, concluded that 4DD's value to its bid team had been destroyed. On either reading, the same point follows: if Leidos genuinely perceived a conflict, it could only have been because Leidos expected TETRA to be deployed pervasively enough across DHMSM to give a TETRA-teamed bidder an unfair advantage; if the stated ground was pretextual, the termination was the mechanism by which

SMS's interference removed 4DD from the team that went on to win. Leidos submitted its proposal without 4DD and was awarded the DHMSM contract.

91. On or about November 13, 2014, the government informed 4DD during a true-up teleconference that it would not be moving forward with TETRA. Internal activity directed at the remaining TETRA environments was already underway: on or around November 12, 2014, the program's Chief Engineer circulated within the agency requests to delete the cloned virtual machines and the one remaining environment in the .com domain. Calvin, who oversaw the AoA and the fly-off, delivered the news. On information and belief, he told 4DD that the decision to drop TETRA had come from the very top, and that he was tired of getting his hand smacked for doing the right thing, and he apologized profusely. On information and belief, the government engineer closest to TETRA's actual performance did not believe the product had failed, and he understood the decision to have been made over his objection.

**M. SMS Blames 4DD During the True-Up**

92. During the true-up, SMS worked to avoid responsibility for its unauthorized copying. On information and belief, SMS knew that, if the overuse were attributed to it, SMS faced a negative performance assessment, and admitting that SMS had made thousands of unauthorized copies would have put the Lockheed acquisition at risk. On information and belief, SMS shifted the blame to 4DD instead. On information and belief, in January 2015, SMS, then a Lockheed Martin company, intentionally presented falsehoods to the government regarding 4DD's licensing requirements, knowing that the information conflicted with contemporaneous pricing documents and agreements between SMS and 4DD, in order to avoid a negative Contractor Performance Assessment Report and removal from the project.

93. SMS's presentation falsely stated that 4DD advised and agreed that 4DD was aware it would not receive compensation for TETRA installations in SMS labs, as the Court of Federal

Claims described it. *See* 143 Fed. Cl. at 125. SMS also took the position that its lab work "was not Government directed or tasked." *Id.* 4DD never so advised, and SMS had no factual basis to claim otherwise. 4DD specifically advised SMS that all of the licenses SMS had installed were supposed to come out of the government purchase. The conversation SMS was relying on for its false statement was a July 2013 exchange in which Weicht sought evaluation licenses for a 30- to 60-day window. Matus told 4DD that he had other direct costs for licenses, but that was only in light of that short window, and those licenses were later paid for by the government as part of the original 64 cores. SMS made these statements to the government officials responsible for deciding whether to continue using TETRA and for determining what the government owed for the copies it had installed, including the DHA contracting officer, the contracting officer's representative for the TETRA licensing agreement, and the program's chief engineer.

94. On information and belief, SMS's January 2015 presentation to the government went further: SMS told the government that 4DD had provided a no-cost license and that there was no TETRA product installed at SMS related to the DMIX project. The Interim License Agreement did not support SMS's position. Its no-fee grant covered only SMS's internal evaluation of TETRA for the Coordinated Software the parties planned to build, at four specified locations. It did not cover any TETRA copy SMS made or used for DMIX, and it had expired on September 1, 2014, more than four months before the review. On expiration it required SMS to return TETRA, destroy every copy, and certify that it had done so. SMS limited its statement about its lab to TETRA tied to the DMIX project. It did not disclose the TETRA instance that remained in SMS's lab after the license expired or, on information and belief, any other copy SMS kept there under the expired private license.

95. SMS's statements during the true-up and at the January 2015 review misrepresented what 4DD had agreed to, failed to account for the number of TETRA instances in environments SMS controlled, and misrepresented whether compensation was owed for them. Each concerned SMS's own reporting and the parties' licensing dealings, and each would have been equally false if TETRA had been published in its entirety. The resulting injury is likewise independent of secrecy: the government abandoned an already-selected product, SMS avoided a negative performance assessment, and 4DD lost licensing revenue and its incumbency, all because of what SMS told the government rather than any use SMS made of 4DD's confidential information.

96. In March 2015, the government executed a contract modification purchasing a "true-up" license from Immix for 168 additional cores at the original contract price, for $1,762,921.12. Immix, identified as "the contractor," executed a release providing that "the contractor hereby releases the government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to this particular modification." The Court of Federal Claims held that the government "fraudulently and materially misrepresented the extent of its copying, which invalidate[d] the release." The 168-core figure was not the product of an audit: the contracting officer's representative later conceded she had "no data from the DTC," and the program's Chief Engineer had ordered TETRA copies in the DTC deleted without disclosing that fact to 4DD.

97. The Court of Federal Claims found that between August 27, 2013, and September 2014, the government, including through SMS, created 47,030 infringing copies of TETRA Healthcare Federator associated with 290,334 computer cores and 41,925 infringing copies of TETRA Studio associated with 171,421 seats, against licenses for 64 cores and 50 seats. On

information and belief, SMS, which performed most, if not all, of that copying, knowingly under-reported the usage as it accrued.

98. On information and belief, because SMS exceeded the license and knowingly under-reported copies as they accrued, the government did not acquire additional use, including through the option CLINs already priced for growth, and the true-up liability accumulated month by month as an unbudgeted obligation. On information and belief, the program office eventually recognized that the license excesses created appropriations exposure under the Anti-Deficiency Act, 31 U.S.C. § 1341, that the funds needed to cure it were unavailable, and that the purchase had been refused above the program office, and that the full extent of the overuse would have required formal ratification of any unfunded commitment before it could be paid. Those circumstances gave government personnel, including the Contracting Officer, reason to minimize the reported overuse, accept SMS's attribution of responsibility to 4DD, and move away from TETRA. On information and belief, the true motivation for the government turning against TETRA was that accumulating liability, not any judgment about the quality of the product itself.

99. On information and belief, SMS had two convergent reasons to keep the overuse from coming to light. First, by the fall of 2014 SMS was negotiating its sale to Lockheed, and an unbudgeted Government-furnished-equipment liability arising from SMS's performance could have affected due diligence, valuation, or the transaction. Second, because the government expected SMS to track TETRA usage, a full accounting would have exposed SMS's own performance and threatened a negative past-performance assessment. On information and belief, SMS knew, or at a minimum had reason to know, that leaving overuse unquantified was substantially certain to prevent the government from licensing that use through the option CLINs and to leave a liability that would disrupt 4DD's relationship with the government. On information

and belief, the only outcome that solved SMS's problem was for 4DD and TETRA to be removed from the architecture and for the decision to be attributed to the product rather than to the unfunded liability that SMS's license excesses caused.

**N. Lockheed Acquires a Healthcare Position Built on TETRA**

100. Lockheed's acquisition of SMS gave Lockheed a data federation and interoperability capability that it did not have. Lockheed announced the acquisition on October 30, 2014, and closed it on December 1, 2014, for $344 million, describing "Systems Made Simple's capabilities in engineering health technology solutions [as] a natural extension of our existing health IT portfolio[.]" Press coverage of the announcement described SMS as "a health IT products provider to the federal government." On information and belief, those "health technology solutions" included the trade secrets and confidential information taken from 4DD, and TETRA was the foundation of the healthcare interoperability position that Lockheed acquired.

101. SMS had no data federation or interoperability product and no history of independent development in data federation before 2013; SMS's claimed capability appeared only after SMS obtained access to TETRA, and the record establishing that fact was available to any acquirer: TETRA had prevailed in the government's AoA, SMS's documents referred to TETRA as being central to its system, and the public DMIX solicitation named TETRA. Due diligence in a transaction of this size examines the origin of, and rights to, key technical assets. SMS's executed agreements with 4DD, each limiting SMS's use of 4DD's confidential information and including the express bar on competitive development, were in SMS's own files and remained in force while Lockheed evaluated SMS. Lockheed also knew the license dispute was open, because the true-up overlapped the due diligence period. On information and belief, Lockheed knew, or at a minimum had reason to know, that the healthcare interoperability capability that Lockheed was acquiring was derived from 4DD's technology and that SMS held only limited, evaluation-scope rights in

that technology, subject to an express prohibition on competitive development. Lockheed proceeded with the acquisition and then continued and expanded the exploitation of 4DD's technology.

102. According to former SMS employee Bob Sheahan, after the acquisition Lockheed required SMS's executives to hand over all emails and documents relating to 4DD, required them to sign what he called gag orders regarding anything 4DD-related, and directed all 4DD inquiries to Lockheed's General Counsel. From December 1, 2014, until Lockheed transferred the business to Leidos in 2016, Lockheed owned and controlled SMS, directed and had the right and ability to control SMS's retention and use of TETRA copies, and had a direct financial interest in that use through the healthcare interoperability position that Lockheed had acquired. At least one TETRA instance remained in SMS's lab on October 31, 2014, the day after Lockheed announced the acquisition, and, on information and belief, TETRA copies remained on SMS's systems when the acquisition closed and during Lockheed's ownership. On information and belief, Fishbeck held equity, options, or transaction-based compensation in SMS whose value turned on the healthcare interoperability position SMS presented to Lockheed, and he realized that value personally when the transaction closed on December 1, 2014.

**O. SMS Builds and Markets eHIIP, a TETRA Derivative**

103. On December 18, 2014, seventeen days after Lockheed closed its acquisition, SMS, then a Lockheed Martin company, demonstrated a TETRA competitor to the government, despite SMS's existing relationship with 4DD and TETRA's inclusion in the DMIX solicitation. That day, David Daniel, a 4DD employee who had worked on SMS's DMIX contract, received an SMS team message reporting that SMS had "just demoed the proof of concept for what was in our DMIX recompete proposal while the government is evaluating the DMIX proposals."

> Matt Jenks (matt) just mentioned @all in the room Team Blast II but you're offline:
>
> Robert Matus (skipper)
>
> Team - ANOTHER HOME RUN! Super job
>
> 10:57 AM
>
> Ron Lattomus
>
> @all Absolutely OUTSTANDING!!!!!!!!!!
>
> 10:57 AM
>
> George McCullen (doc)
>
> @all thanks for helping me with the demo. And have a great holiday.
>
> 10:58 AM
>
> Matt Jenks (matt)
>
> @all Well done! Dave Calvin definitely liked what he saw! And to give you all a little a context, this team just demoed the proof of concept for what was in our DMIX recompete proposal while the government is evaluating the DMIX proposals. By the way, Dave Calvin is heading up that technical evaluation!
>
> 11:07 AM
>
> Matt Jenks (matt)
>
> @all I want to wish everyone, Happy Holidays, Merry Christmas, and a Happy New Year! I know I've been absent much of the time since thanksgiving, but I could do that because I know what this team IS capable of and you just hit a home run. Everyone on the team played a role and I thank you very much. You ARE an awesome team!

104. On July 2, 2015, under Lockheed's ownership and direction, SMS personnel involved in the strategic partnership discussions, Ronald Stuart Fishbeck, Robert Timothy Sax, Daniel J. Ramunda, Jr., and Viet-Dung Nang Nguyen, each of whom had access to TETRA in SMS's corporate lab and to 4DD's confidential technical materials, filed in their own names as inventors a patent application for a "System and Method for Facilitating Multi-Source Retrieval and Presentation of Health Care Information," Application No. 14/790,999, which published on January 5, 2017, as U.S. Patent Application Publication No. 2017/0004257 A1. The application's specification describes a system that performs functions that SMS's personnel had watched

TETRA perform during their access to it. Its timing, its inventors, and its subject matter show that SMS used its access to TETRA and to 4DD's confidential technical materials to define and develop the competing capability that SMS called eHIIP.

105. 4DD did not discover, and in the exercise of due diligence could not reasonably have discovered, before July 29, 2014, that SMS had misrepresented its purpose in the Interim License Agreement and its addenda. SMS had put its statements of purpose and its promises in signed agreements. SMS's chief executive promised in writing that SMS would not use 4DD's technology to develop a competitive product, and 4DD continued to deal with SMS as a partner through the summer of 2014. 4DD could not have known that SMS had built a competing capability of its own before October 2, 2014, when Fishbeck publicly described SMS's "own internal R&D" in data interoperability. On December 18, 2014, Daniel received the SMS team message reporting SMS's proof-of-concept demonstration to the government. The January 5, 2017 publication of Application No. 14/790,999, naming as inventors Fishbeck and other SMS personnel who had worked with TETRA, and describing a system whose components correspond to TETRA's architecture, confirmed that SMS had used its access to TETRA to build that capability.

106. SMS called this technology the "Enterprise Health Information Interoperability Platform" ("eHIIP"), but eHIIP was a TETRA derivative by another name. Lockheed actively marketed eHIIP, including with an add-on "Care Coordination Module" ("CCM"), the type of software that 4DD and SMS were to develop together under their strategic partnership. In an eHIIP-CCM demonstration video that Lockheed published to its YouTube channel on June 22, 2016, eHIIP pulls patient data from multiple sources, normalizes it across differing coding systems, and assembles that data into a computable discharge care plan based on the Fast

Healthcare Interoperability Resources (FHIR) standard. Those are TETRA's core capabilities: multi-source retrieval, normalization across heterogeneous healthcare terminologies, and generation of unified outputs for downstream use. The non-public architecture, schema mappings and transformation rules, and data management algorithms that make those capabilities work are 4DD's trade secrets.




**P. SMS Strips 4DD's Marks From TETRA**

107. On information and belief, during 2014, while SMS was looking for a buyer, SMS ran 4DD's TETRA software in demonstrations to prospective business partners and prospective acquirers of SMS and told those audiences that the technology being demonstrated was SMS's own. In those demonstrations SMS also used 4DD's marketing and technical documents as its own, after removing the 4DD logo and branding and replacing them with SMS graphics. The software SMS demonstrated was 4DD's executable code. On information and belief, SMS ran the

TETRA builds that 4DD installed on SMS's systems for the license evaluation, or unaltered copies of those builds. 4DD produced that software and marked it with the TETRA mark to identify 4DD as its source, and TETRA falls within the goods recited in Registration No. 4532091.

108. 4DD learned of this conduct in 2015 from Todd Schwartzrock, SMS's CIO-SP3 Program Manager during 2014. Schwartzrock worked on SMS's TETRA business from the inside. In March 2014 he was involved in setting up a TETRA 3.0 demonstration environment in Austin, and in August 2014, he wrote to 4DD that TETRA was the only product identified in the statement of work requirement that day for the DMIX recompete. SMS fired Schwartzrock in December 2014, immediately after the Lockheed acquisition closed. In several meetings with McPhatter in 2015, Schwartzrock told 4DD that SMS had used TETRA in demonstrations to prospective business partners and prospective acquirers of SMS while indicating that the technology was SMS's; that in those settings SMS used 4DD's marketing and technical documents as its own, removing the 4DD logo and branding and replacing them with SMS graphics; and that SMS did this while it was trying to build its own "TETRA," the effort described above. Before those meetings, 4DD did not know that SMS had presented TETRA to outside companies as SMS's product without accompanying TETRA designations.

109. On information and belief, the demonstrations occurred in the second half of 2014, while SMS was looking for a buyer and before it agreed to the Lockheed transaction announced on October 30, 2014. Schwartzrock tied them to SMS's effort to build its own "TETRA," and SMS was planning to replace TETRA by early October 2014: on information and belief, its DMIX presentation to the government in or around October 2014 advocated that the government move away from TETRA. A TETRA instance was still in SMS's lab on October 31, 2014. The dates of the demonstrations, the companies that attended, and the materials SMS used are recorded in

SMS's calendars, presentation files, and business development records, which are in Defendants' possession.

110. 4DD never authorized SMS to show TETRA to outside companies in these late 2014 demonstrations. The Interim License Agreement allowed SMS to use, execute, and display TETRA internally, in object code, at four specified locations, and only to validate TETRA's performance for the Coordinated Software the parties planned to build, and to access 4DD's SDK for its limited demonstration product for the February 2014 HIMSS conference. Without 4DD's prior written permission, SMS could not market or distribute the Technology, use it beyond the permitted uses, or "otherwise provide access to the Technology to third parties." SMS had no right to "use the Technology in the operation of its business or provision of services to any third party" or to "derive revenue" from it. 4DD retained all rights in the Technology, including its trademark rights. Addendum No. 2 kept each of these restrictions in force after the term ended. 4DD gave no permission, written or otherwise, for the demonstrations described above.

111. None of that conduct depended on the secrecy of 4DD's information. SMS took software that 4DD produced, told outside companies that it was SMS's, and presented it with 4DD's own documents carrying SMS's graphics in place of 4DD's. The resulting confusion, and the diversion of credit that followed, would have occurred if every technical detail of TETRA had been public. SMS knew that this conduct departed from the branding the parties had discussed, under which any jointly branded product would keep TETRA visible as a designator of source, and from the license restrictions and competitive-use prohibition in its executed agreements. No Definitive Agreement fixing joint or OEM branding was ever executed.

112. The audiences for those demonstrations were companies SMS was courting as business partners or as acquirers of SMS. On information and belief, those companies were

evaluating the healthcare data interoperability capability SMS claimed to have as a basis for partnering with or acquiring SMS. Shown 4DD's software under SMS's name, together with 4DD's documents bearing SMS graphics, they had no way to learn that 4DD produced what they saw, and they understood SMS to be its source. The demonstrations credited SMS with a data federation capability that SMS did not have and had no internal capability to build, they denied 4DD recognition as TETRA's producer among companies in the market for that capability, and they presented 4DD's product as an SMS asset to the companies deciding what SMS was worth.

### Q. SMS's Private Copies Fall Outside Any Government Authorization

113. Separate from any work SMS performed for the government, SMS copied and used TETRA in its own corporate environment for its own commercial purposes under the Interim License Agreement, a private commercial license that expired on September 1, 2014, and that SMS sought in order to evaluate a potential strategic partnership, explore building "Coordinated Software," and create a limited demonstration at the February 2014 HIMSS conference. No government authorization or consent extended to SMS's use of that license, and no government contract called for it. The Court of Federal Claims found that copying occurred through SMS's development lifecycle in SMS's labs as well as at the DTC, and the government authorized and accepted liability for the copies SMS made in testing and configuring TETRA for the DMIX project. Count III does not seek recovery for those channeled copies. *See infra* Section T. SMS made and used the copies at issue on its own initiative, for its own commercial purposes, for uses having no testing or configuration function on the DMIX project, and outside anything the government authorized, directed, or paid for. Those uses included the December 18, 2014 demonstration of a TETRA competitor and the July 2, 2015 patent filing, and, on information and belief, the cloning template and the demonstrations to prospective partners and acquirers. SMS also kept TETRA on its systems after the license expired on September 1, 2014, and, on

information and belief, used those copies after that date; copies remained on systems within SMS's environment after each acquisition closed.

114. The Interim License Agreement prescribed what SMS had to do when the license ended. Upon expiration or termination, SMS "shall promptly (i) return the Technology to 4DD; (ii) permanently purge and destroy any and all copies . . . from all machines . . . ; and (iii) provide written certification to 4DD . . . within five (5) days of such expiration or termination." Addendum No. 2 made that obligation survive the end of the term. The license expired on September 1, 2014, and SMS's certification was due by September 6, 2014. SMS did not return TETRA and did not provide the certification. The duty to remove TETRA from SMS's machines was SMS's, and 4DD never agreed to let SMS keep TETRA after September 1, 2014.

115. SMS did not purge TETRA. On October 30, 2014, Lockheed announced its agreement to acquire SMS. The next day, Truxillo sent the announcement to Andrew Plummer of TRSS, who had been working jointly with SMS and 4DD in connection with the DMIX project and 4DD's congressional advocacy effort. Plummer asked Truxillo why 4DD's TETRA test instance was still in the SMS lab, Truxillo answered "That is news to me if it is[,]" and Plummer responded, "Oh it's in there." On information and belief, the instance Plummer described was a TETRA installation made for the license evaluation, and it remained in SMS's lab two months after the license expired and after SMS's deadline to purge it and certify its destruction had passed. On information and belief, SMS kept that instance, and other TETRA copies, on its systems through the Lockheed closing on December 1, 2014 and afterward.

116. No contracting officer instruction, specification, drawing, or written direction required SMS to install TETRA in its corporate lab, build a template for cloning it for its commercial purposes, exhibit it under SMS branding, demonstrate it to prospective partners and

acquirers, or retain it after the license expired. The government did not accept delivery of any of those copies, and none was made in performing any government contract. Non-infringing alternatives were available to SMS for its evaluation, including use of the single licensed installation on the terminals the license specified.

117. On information and belief, SMS made additional copies of TETRA in its own environment, outside the scope of both the private license and any government authorization, while developing eHIIP. The basis for that belief includes the cloning template; SMS's internal discussions of rebranding TETRA and positioning a fake TETRA as its own platform; the express contractual bar on using TETRA to develop a competitive product; and the short interval between SMS's access to TETRA and its marketing of eHIIP. Records of SMS's development, version control, and virtual machine provisioning are within Defendants' exclusive possession.

**R. Leidos, With Notice of 4DD's Claims, Acquires SMS**

118. In August 2016, Lockheed separated its IS&GS business, including SMS, and combined it with Leidos in a transaction valued at approximately $4.6 billion. In 2016 investor presentations filed with the Securities and Exchange Commission, Leidos described the combined company's "Healthcare Information" business, "Engineering Secure, Productive Healthcare Solutions," as an approximately $1.6 billion business based on 2015 estimates, and depicted about $960 million of it as attributable to IS&GS. Leidos's CEO, Roger Krone, noted that Lockheed's healthcare information technology work was part of why Leidos pursued the merger.

119. Leidos knew about 4DD and TETRA before Leidos acquired SMS. Leidos therefore knew that 4DD owned TETRA and that TETRA was the data federator the government had purchased on DMIX. By the closing, the dispute over TETRA was also a matter of public record. On August 28, 2015, 4DD filed *4DD Holdings, LLC v. United States*, No. 15-945C, in the Court of Federal Claims, alleging that TETRA had been copied and deployed without

authorization. On September 17, 2015, 4DD sent SMS a preservation notice enclosing that complaint and covering SMS's TETRA-related contracts, communications, copying, and DHMSM materials. On July 29, 2016, less than three weeks before the closing, SMS executed the tolling agreement described below, which recites that 4DD may assert claims against SMS arising from SMS's TETRA-related conduct, states that SMS expected to be acquired by Leidos, and purports to bind Leidos. On information and belief, Leidos learned of the Court of Federal Claims action, 4DD's potential claims, and the tolling agreement in its due diligence, and SMS's records concerning 4DD and TETRA passed to Leidos at closing.

120. SMS has operated as a Leidos subsidiary, owned and controlled by Leidos, since 2016, and by spring of 2017, Leidos and SMS had received subpoenas in connection with *4DD Holdings, LLC v. United States*. Leidos also marketed eHIIP as its own. As of May 9, 2018, Leidos's website (www.leidos.com/sites/default/files/responsive/Health/enterprise-health-information-interoperability-platform-eHIIP-FS.pdf) offered a Leidos-branded product sheet describing "[t]he Leidos Enterprise Health Information Interoperability Platform (eHIIP)" as supporting "the healthcare industry's need to gather, transform, process and present healthcare information from disparate sources for multiple purposes."




## S. Defendants' Federal Awards

121. The federal awards followed. In August 2015, Lockheed's SMS and Epic won a $624 million VA contract to overhaul the Veterans Health Administration healthcare system. In March 2016, SMS took a roughly $262 million task order to streamline processing of veterans' disability claims. In April 2017, Leidos's SMS received a $29 million VA task order under the Repositories Program, supporting products including the Health Data Repository, and in March 2018 SMS took a roughly $472 million task order to consolidate data centers and update cloud computing services for the VA's IT modernization. Each award fell in the general field in which

TETRA had prevailed in the government's own competition, and each followed SMS's acquisition by Lockheed and then Leidos.

122. On information and belief, Defendants used the data federation capability that SMS acquired through its access to TETRA to win and perform those contracts, foreclosing opportunities that TETRA's performance had put within 4DD's reach, and Leidos's SMS performed the April 2017 and March 2018 task orders using the capability SMS had built from 4DD's non-public architecture, schema mappings and transformation rules, and data management algorithms. Leidos also won the DHMSM contract after dropping 4DD from its bid team, and the data federation portion of that program was the capability 4DD expected to supply.

123. On information and belief, the harm continues. Lockheed has continued to market eHIIP and its Care Coordination Module, including through the June 22, 2016 video; Leidos marketed eHIIP under its own name; and purchasers exposed to that marketing remain confused about who produced the software and materials that Defendants presented as their own. 4DD's anticipated licensing revenues and expansions within DMIX and DHMSM did not materialize, Defendants took the revenues and contract positions built on the capabilities that TETRA had proven, and 4DD's reputation as the source of TETRA has been diminished.

### T. The Court of Federal Claims Action Covered Only the Government's Authorized Copies

124. 4DD sued the United States in the Court of Federal Claims under 28 U.S.C. § 1498(b), which channels to the United States alone a claim for infringement that the government authorizes or consents to. That court entered judgment for 4DD of $12,683,065.86, consisting of the court's damages award of $11,292,579.09 plus delay compensation; on July 16, 2026, the Federal Circuit affirmed in part, vacated in part, and remanded, and the action remains pending on remand. The Federal Circuit affirmed the use of a hypothetical negotiation but held that the trial

court erred by relying on the government's later cancellation of TETRA, and it remanded for that court to determine, without that hindsight, whether the parties would have negotiated development or production licenses for the government's non-backup copies. Whatever the Court of Federal Claims awards on remand compensates 4DD for the government's own authorized use of those copies. It does not compensate 4DD for losses beyond the government's own use of those copies, including the enterprise deployment and licensing expansion that Defendants' conduct prevented, which that court had no jurisdiction to address.

125. Section 1498(b) channeling reaches only as far as the government's authorization and does not extend to copies a contractor makes on its own initiative for its own commercial purposes. The Court of Federal Claims did not adjudicate whether every TETRA copy SMS created fell within the government's authorization. That court's 2019 decision held that SMS acted for the government, with its authorization or consent, when it tested and configured TETRA on the DMIX project, including copying TETRA virtual machines in SMS labs that the agency directed and approved, and that the government accepted liability for SMS's lab use in the March 2015 modification. *4DD Holdings,* 143 Fed. Cl. at 128-30. That holding was bounded by the question before the court; the court did not decide whether SMS's use of TETRA under the Interim License Agreement, to develop a competing product, to exhibit TETRA, to demonstrate it to prospective business partners and acquirers, and to retain copies after the license expired, was for the government. Those were acts SMS undertook on its own initiative for its own benefit. SMS itself attributed its lab use of TETRA to the Interim License Agreement, its private license with 4DD, in its January 2015 review.

**U. The Tolling Agreement**

126. 4DD, SMS, and T4 Data Group LLC (4DD's wholly owned subsidiary) entered into a tolling agreement on July 29, 2016, that tolled:

> "[a]ny and all statutes of limitations, statutes of repose, laches or any other time-based limitations on actions or defenses, whether at law, in equity, under statute, contract, or otherwise, and whether under the laws of the United States of America or any state or territory thereof, or of any other applicable jurisdiction, that might be asserted as a bar, limitation, or defense to any suit, action, arbitration, claim, counterclaim or defense between or among the Parties [to this agreement] in any jurisdiction or forum arising from or relating in any way to the facts or allegations in *4DD v. U.S.* and/or any claim or cause of action for copyright infringement, breach of contract . . . fraudulent inducement . . . unjust enrichment, . . . tortious interference (including with contract, prospective contract, business relations, business expectancy and/or prospective economic advantage), conspiracy, misappropriation of trade secrets . . . and any other claim or cause of action not specifically referenced here but relating to access to, copying, or use of TETRA . . . shall be and are hereby tolled through the date that is six months following the conclusion of *4DD v. U.S.*, including the expiration of any appeals therefrom . . . such that no claim that would have been timely if filed on [the] Tolling Date shall be considered untimely if filed before the end of the Tolling Period."[4]

127. On information and belief, Lockheed, the parent company of SMS at the time of the tolling agreement, manifested an intent to be bound by the tolling agreement by participating in, and controlling, its negotiation.

128. The tolling agreement binds SMS's successors and assigns, which include Lockheed and Leidos. The tolling agreement names both Lockheed ("Systems Made Simple, Inc., a Lockheed Martin Company") and Leidos ("The Parties understand that SMS expects within several months of the Tolling Date to be acquired by Leidos Holdings, Inc. or an affiliate thereof (collectively, 'Leidos')."), and SMS agreed "that this Tolling Agreement is binding on SMS's successors and assigns, and that SMS has authority to bind its successors and assigns, including, without limitation, Leidos." In the alternative, on information and belief, Leidos assumed SMS's

[4] Ex. C (Tolling Agreement, dated July 29, 2016)

obligations under the tolling agreement expressly or impliedly, as a successor by merger, or by estoppel.

129. The tolling agreement expressly tolls claims for copyright infringement, unjust enrichment, tortious interference, and misappropriation of trade secrets. The agreement's residual clause, reaching "any other claim or cause of action not specifically referenced here but relating to access to, copying, or use of TETRA," covers 4DD's Lanham Act claim, which rests on Defendants' presentation of software 4DD produced as goods of their own origin. The tolling period runs through six months after the conclusion of *4DD Holdings, LLC v. United States*, including the expiration of any appeals, and that action remains pending.

**COUNT I**
**Misappropriation of Trade Secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836)**
**(against SMS, Lockheed, and Leidos)**

130. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

131. 4DD owns the trade secrets identified above, which relate to products and services used in and intended for use in interstate commerce. 4DD took reasonable measures to keep that information secret, and that information derives independent economic value from not being generally known or readily ascertainable.

132. Defendants acquired, disclosed, and/or used 4DD's trade secrets without consent, despite duties under the Strategic Partnership NDA, the Letter of Intent, the Interim License Agreement, and the Addenda to maintain their secrecy and limit their use.

133. Defendants misappropriated 4DD's trade secrets on and after May 11, 2016, the date the Defend Trade Secrets Act took effect, by using them. For example, Lockheed marketed the capability built from those trade secrets, including through its June 22, 2016 video, and, on information and belief, Leidos's SMS used that capability to market eHIIP and to obtain and

perform the April 2017 and March 2018 VA task orders. In addition, Patent Application No. 14/790,999 was filed shortly after Lockheed's acquisition of SMS, and that filing further confirms SMS's access to and use of TETRA's trade secrets. Lockheed and Leidos are each liable as a successor that assumed or benefited from SMS's contracts, obligations, and product positions, and for its own use of 4DD's trade secrets with knowledge, or reason to know, that SMS had acquired them under a duty to limit their use.

134. Defendants' misappropriation was willful and malicious. 4DD seeks damages for actual loss and for unjust enrichment not taken into account in computing actual loss, or, if 4DD is unable to prove a greater amount by other methods of measurement, a reasonable royalty; exemplary damages of up to twice the amount of those damages; attorneys' fees; and injunctive relief prohibiting further use or disclosure of 4DD's trade secrets. 4DD pleads the exemplary damages on this count in the alternative to the enhanced remedies sought on Counts II, IV, and VI and does not seek duplicative enhanced recovery for the same injury. This claim is timely.

## COUNT II
## Reverse Passing Off under § 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) (against SMS only)

135. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

136. 4DD produced the goods at issue in this count: the TETRA software that SMS ran in its 2014 demonstrations to prospective business partners and prospective acquirers of SMS. That software was 4DD's executable code, in builds that 4DD installed on SMS's systems for the license evaluation or, on information and belief, in unaltered copies of those builds. 4DD marked TETRA with the TETRA mark to identify 4DD as its source, and 4DD sells TETRA in interstate commerce to government and commercial customers.

137. On information and belief, SMS falsely designated itself as the origin of those goods. In those demonstrations SMS ran 4DD's software, represented that the technology was SMS's, and presented it with 4DD's marketing and technical documents from which SMS had removed the 4DD logo and branding and substituted SMS graphics. Those documents described and depicted the software being demonstrated. By putting SMS's graphics where 4DD's had been, SMS told its audience that SMS produced the software. SMS did this in the second half of 2014, including, on information and belief, after the license expired on September 1, 2014, and in each instance without 4DD's knowledge or permission.

138. SMS's false designation was likely to cause, and on information and belief did cause, confusion among the companies that attended the demonstrations about who produced the software they were shown. 4DD was harmed by the display of its software as SMS's product. The demonstrations credited SMS with a data federation capability that belonged to 4DD, denied 4DD recognition as TETRA's producer among companies evaluating healthcare interoperability technology, diverted to SMS the commercial credit for 4DD's product, and presented 4DD's product to SMS's prospective acquirers as an SMS asset. Those injuries are to 4DD's commercial interest in its reputation and sales, and they flow directly from SMS's misrepresentation of the source of 4DD's goods.

139. This count is confined to SMS's presentation of software that 4DD produced as goods of SMS's own origin. 4DD does not premise it on Defendants' copying of any idea, method, or concept embodied in TETRA, on eHIIP or any other product that Defendants produced, on any authorship or inventorship interest, or on the secrecy of 4DD's information. 4DD's rights in the TETRA mark do not depend on registration. SMS acted willfully. It knew that the TETRA mark identified 4DD as the source of the software, it had actual notice of 4DD's registration through

Addendum No. 2, which renders the mark "TETRA®," and it knew that 4DD retained all rights in the Technology, including its trademark rights, and had not permitted SMS to show TETRA to third parties. 4DD seeks SMS's profits attributable to the false designation, 4DD's actual damages, up to three times those damages, costs, and attorneys' fees under 15 U.S.C. § 1117(a) because this is an exceptional case. The conduct alleged in this count occurred in the second half of 2014, 4DD learned of it in 2015, and the tolling agreement tolls this claim. This claim is timely and runs against SMS only.

**COUNT III**
**Copyright Infringement (17 U.S.C. § 501)**
**(against SMS, Lockheed, and Leidos)**

140. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

141. 4DD owns a valid, registered copyright in the TETRA computer program. SMS reproduced TETRA in copies containing 4DD's original object code beyond the scope of the Interim License Agreement and its Addenda. On information and belief, SMS did so by building and using a cloning template to replicate TETRA across its own systems, running TETRA in demonstrations to prospective business partners and prospective acquirers of SMS under SMS branding, making additional copies while developing eHIIP, and retaining and running copies after the license expired on September 1, 2014, including the TETRA instance that remained in SMS's lab on October 31, 2014. Copies of licensed software infringe where they include the licensor's original code and the copying exceeds the scope of the license, whether or not a given copy is runnable and whether or not it has associated cores.

142. SMS undertook those acts on its own initiative, for its own commercial purposes, outside the scope of any work that SMS performed for the United States on the DMIX project, and the United States neither authorized nor consented to them, expressly or by implication. 4DD does

not seek recovery on this count for the 168 cores that the government paid for by contract modification in March 2015, for any copy SMS made in testing and configuring TETRA for the DMIX project in SMS labs or the DTC, or for the copies adjudicated in *4DD Holdings, LLC v. United States*.

143. SMS, which remains a defendant and a subsidiary of Leidos, is liable as the direct infringer. Lockheed is liable for SMS's infringement from December 1, 2014, until 2016 as a vicarious and contributory infringer, including for the TETRA copies that remained in SMS's lab when Lockheed announced and closed the acquisition, and as a successor that assumed or benefited from SMS's contracts, obligations, and product positions. Leidos has owned and controlled SMS since 2016 and is liable on the same grounds for SMS's retention and use of TETRA copies during its ownership. 4DD seeks actual damages and any additional profits attributable to the infringement, injunctive relief, and impoundment and destruction of infringing materials and of the means by which such copies may be reproduced. This claim is timely.

**COUNT IV**
**Tortious Interference with Prospective Business Relations (Virginia Law)**
**(against SMS and Lockheed only)**

144. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

145. **The DMIX expectancy**. 4DD had a reasonable business expectancy in the continued licensing, expansion, and deployment of TETRA within the DMIX program. It had a reasonable expectancy that the government would license TETRA and grow its licenses to enterprise deployment through the CLINs it had priced for that growth and through its inclusion on Immix's SEWP contract. That expectancy is grounded in the government's market research, Analyses of Alternatives, and fly-off; its brand-name and sole-source acquisition steps; its purchase, license, and option structure; the DMIX renaming and program dependency; the Industry

Day statements; and the August 28, 2014 solicitation naming TETRA. That record establishes a probability of future economic benefit rather than a possibility of one. The government had selected TETRA, bought it, installed it in its development and test environments, licensed it under an executed agreement, priced future option years to expand it, and named it in the solicitation governing the integration work ahead. Absent Defendants' conduct, it was reasonably certain that the government would have continued to license and expand TETRA within DMIX through enterprise deployment.

146. **The DHMSM expectancy**. 4DD had a further, derivative expectancy that TETRA would supply the data mediation layer on which DHMSM integration depended. The government designed DMIX and DHMSM to operate in tandem and said so in its engineering plan, budget submissions, and Industry Day statements, and, on information and belief, it had certified that no product other than TETRA would satisfy its requirement, would have deployed TETRA in the environments that DHMSM would draw on, and had named TETRA in the solicitation that governed the integration work. Absent Defendants' conduct, it was reasonably certain that TETRA would have supplied that layer, and the market shared that expectation. 4DD asserts both the DMIX and DHMSM expectancies in this single count; the DHMSM expectancy is derivative of, and not a substitute for, the DMIX expectancy. The SMS and Leidos agreements corroborate the parties' working relationship and the market's expectation; they do not supply the expectancy, which arises from the government's acquisition record.

147. SMS, which became 4DD's competitor, and later Lockheed knew of these expectancies. SMS designed and administered the fly-off, gathered the pricing, recommended that the government buy a data federator, characterized TETRA as being central to its own system, knew that the government had selected TETRA by name through brand-name and sole-source

acquisition steps and that 4DD expected the DMIX license to grow to enterprise deployment, and read the August 28, 2014 solicitation naming TETRA. Lockheed acquired the same knowledge.

148. SMS was not 4DD's competitor when their relationship began. SMS was a services company with no software product offerings, and it partnered with 4DD because 4DD supplied the data federation capability that SMS lacked. SMS became 4DD's competitor while 4DD's expectancies were pending. For example, on October 2, 2014, Fishbeck publicly announced that "[t]he company that masters data interoperability will be at the forefront of the healthcare IT marketplace and we plan to be that company." Further, on December 18, 2014, while the government was evaluating the DMIX proposals, SMS demonstrated to the government a TETRA competitor that it characterized as "the proof of concept for what was in our DMIX recompete proposal." By then, SMS stood to gain directly from the loss of the expectancies with which it was interfering.

149. Neither SMS nor Lockheed was a party to the expectancy with which it interfered. The interest this count protects is 4DD's own expectancy of continued licensing, expansion, and deployment of TETRA, and of the revenue that would have followed, in which no Defendant held any interest. SMS's position as prime contractor gave it a role in the government's program and duties that it owed the government, but gave it no authority to act for the government in the government's dealings with 4DD, and the acts alleged in this count fell outside any authority the government gave SMS. In performing those acts, SMS pursued its own interests at the expense of the government that it served.

150. SMS and Lockheed acted without lawful justification. SMS's prime contract gave it access to environments where TETRA was installed, and it knew the government turned to SMS to account accurately for TETRA activity. SMS knew or had reason to know that the government

would eventually be charged for the TETRA installations in SMS's lab environment for the DMIX project. It had no right to under-report installations, to encourage the government to delete rather than report and pay for over-installs, or to tell the government that 4DD had agreed to terms that 4DD never agreed to, and no agreement between SMS and 4DD authorized that conduct.

151. SMS and Lockheed intentionally interfered with 4DD's expectancies by improper means and for improper purposes. On information and belief, that interference began at least as early as February 2014, when 4DD first raised questions to SMS regarding TETRA copies that exceeded the license, and continued at least through early 2015. Before the government's September 3, 2014 statement that it would move away from TETRA, SMS reported TETRA activity to the government regularly and, when asked, accounted for the TETRA activity in the environments it operated. SMS knew that the government licensed TETRA per processor core, that it had purchased licenses for 64 cores, that 4DD had been addressing license overages since February 2014, and that the government would be charged for licenses in SMS's labs for the DMIX project. SMS nonetheless deliberately circumvented 4DD's license enforcement mechanism by cloning virtual machines having TETRA already installed, created thousands of TETRA copies in its own environment for the DMIX project without telling the government about the sheer magnitude of additional cost involved, and recommended that the government delete certain TETRA copies when it observed overages in government environments. SMS therefore knew, or at a minimum had reason to know, that its conduct was substantially certain to prevent the government from acquiring the licenses its use required, and to leave an unbudgeted liability for past use that would surface and disrupt 4DD's relationship with the government.

152. On information and belief, the improper means employed on and after the government's September 3, 2014 statement, and pleaded as the conduct that prevented

reinstatement and extinguished the priced option years, include, without limitation: advocating in or around October 2014 that the government move away from TETRA; making false statements to the Defense Health Agency and other government decision-makers during the true-up about what 4DD had agreed to, how many TETRA instances existed in environments SMS controlled, and whether compensation was owed for them, culminating in SMS's January 2015 presentation; and stripping 4DD's marks from 4DD's marketing and technical documents and presenting them, in addition to 4DD's executable code, as SMS products.

153. On information and belief, SMS's motive was to remove TETRA and attribute the government's decision to the product rather than to the liability that SMS's knowing under-reporting created. But for SMS's and Lockheed's interference, 4DD would have realized additional production licenses, options, and expansions within DMIX and related procurements. SMS's and Lockheed's conduct preceded the government's decision to move away from TETRA, and the sequence runs in one direction: SMS purposefully under-reported installations while an unbudgeted liability accumulated; DHA announced on September 3, 2014 that it would be done with TETRA; on information and belief, in or around October 2014, SMS gave a DMIX presentation to the government advocating that the government move away from TETRA; on October 16, 2014, Leidos terminated 4DD's teaming agreement; on or about November 13, 2014, the official who had overseen the AoA and fly-off told 4DD that the decision to sideline TETRA had come from the very top; and SMS's January 2015 presentation closed the door on reinstatement and extinguished the option years that the licensing arrangement had priced.

154. 4DD's damages include, first, the licensing revenue that the government's existing agreement had already priced: the option years that the delivery order priced in advance, which the government did not exercise after the March 16, 2015 true-up modification. These amounts are

fixed on the face of an executed instrument and do not depend on any projection of future deployment.

155. 4DD's damages further include the enterprise deployment, licensing expansion, and program position that SMS's and Lockheed's conduct foreclosed, including the DHMSM expectancy. Those damages include the production licensing that the government, absent SMS's and Lockheed's conduct, would have purchased for the TETRA environments it had already installed on DMIX. 4DD will credit against any recovery on this count amounts it recovers from the United States under 28 U.S.C. § 1498(b) for the government's use of the same copies, and does not seek the same production value twice. The scale of the foreclosed deployment is measured by per-site pricing, and, on information and belief, the DMIX business case records a lifecycle cost estimate exceeding one billion dollars through fiscal year 2030. 4DD's late-2013 offer to supply TETRA for approximately $450 million, derived from the same per-site exercise, corroborates how 4DD priced against that scale but is not pleaded as the measure of damages. 4DD will establish its damages through discovery and expert proof.

156. SMS's and Lockheed's conduct was willful and malicious, entitling 4DD to punitive damages to the extent permitted. 4DD does not premise this count on the misappropriation of its trade secrets or confidential information. Each improper means alleged is a false statement about licensing or source or a breach of a duty that SMS assumed by contract, and each is actionable without regard to whether 4DD's information was secret. This claim is timely.

**COUNT V**
**Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act**
**(against SMS, Lockheed, and Leidos)**

157. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

158. 4DD owns the trade secrets identified above, which derive independent economic value from not being generally known or readily ascertainable and which 4DD took reasonable measures to keep secret. SMS, Lockheed, and Leidos misappropriated those trade secrets by acquiring, disclosing, and/or using them without consent and with knowledge of duties to maintain their secrecy and limit their use arising from the instruments described above.

159. SMS used 4DD's trade secrets to define, develop, and market a competing platform. Beginning January 10, 2014, SMS personnel, including Fishbeck, Sax, Nguyen, and Ramunda, had regular access to TETRA, its technical documentation, and 4DD's confidential roadmap, and they used 4DD's non-public system architecture and deployment topology, schema mappings and transformation rules, proprietary API endpoints and interface specifications, and data management algorithms and schema to define and develop eHIIP, as the timing, inventors, and subject matter of SMS's July 2, 2015 patent application confirm. On information and belief, SMS's misappropriation also included disclosing 4DD's confidential information to prospective acquirers, and attempting to obtain patent protection for aspects of TETRA that SMS had not developed.

160. Lockheed and Leidos continued and expanded that use after acquiring SMS, including through their marketing of eHIIP. Each is liable as a successor that assumed or benefited from SMS's contracts, obligations, and product positions, and for its own use with knowledge, or reason to know, that SMS had acquired the trade secrets under a duty to limit their use.

161. Defendants' misappropriation was willful and malicious, and it caused 4DD actual loss and unjustly enriched Defendants. 4DD's actual loss includes the licensing and expansion revenue that 4DD would have earned had SMS not used 4DD's technology to field a competing product. Defendants' unjust enrichment includes the development costs SMS avoided by building

eHIIP from 4DD's architecture, the revenue earned on federal healthcare awards obtained using that capability, and the portion of the Lockheed and Leidos acquisition consideration attributable to the position that SMS had built on 4DD's technology. 4DD seeks those damages or, to the extent it cannot prove a greater amount by other methods of measurement, a reasonable royalty, together with exemplary damages, attorneys' fees, and injunctive relief. This claim is timely.

**COUNT VI**
**Unjust Enrichment (Virginia Law)**
**(against SMS, Lockheed, and Leidos)**

162. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein, except that 4DD does not incorporate into this count, and does not rely on for this count, the allegations that its information constitutes a trade secret or that Defendants acquired, disclosed, or used any trade secret of 4DD.

163. 4DD pleads this count in the alternative to its contract-based remedies and only as to benefits that no contract between 4DD and any Defendant governs. The Interim License Agreement expired on September 1, 2014. Its surviving provisions required SMS to return and destroy TETRA and continued to limit SMS's use of the Technology, but no agreement between 4DD and SMS governs the benefits described below: the revenue, market position, and acquisition value that Defendants obtained by presenting 4DD's capability to the market as their own. As to Lockheed and Leidos, no contract governs the benefits described below. To the extent a court determines that an express contract governs any benefit described below, 4DD does not seek restitution of that benefit on this count.

164. Defendants knowingly received and retained benefits belonging in equity to 4DD. SMS held itself out to the federal market as the producer of a working healthcare data federation capability that it had not built and retained the revenue and market position that followed;

Lockheed received that capability with SMS and the 2015 and 2016 awards; and Leidos received that capability in the IS&GS transaction, to which its investor presentations attributed approximately $960 million of the combined company's healthcare information business, along with the 2017 and 2018 task orders. Defendants received those benefits at 4DD's expense and gave 4DD nothing for them.

165. Retaining those benefits without paying 4DD is inequitable. 4DD delivered its software and technical materials to SMS for a defined purpose, on the understanding that any product built on TETRA would be developed jointly and that the TETRA mark would remain visible as a designator of source. Defendants instead took the capability, presented it to the federal market as their own, and carried it through two acquisitions, knowing that it was 4DD's. Defendants should have expected to pay for what they received.

166. 4DD seeks restitution of the value of those benefits and disgorgement of the profits Defendants retained, measured by the revenue Defendants earned on the federal awards resting on the capability derived from 4DD's software and by the portion of the Lockheed and Leidos acquisition consideration attributable to that capability. This count does not depend on whether 4DD's information was secret: Defendants would have been equally enriched, and equally obliged to pay, if every technical detail of TETRA had been published, because what they received was a working capability that they presented to the market as their own. This claim is timely.

**COUNT VII**
**Fraudulent Inducement (Virginia Law)**
**(against SMS only)**

167. 4DD incorporates paragraphs 1 through 129 as if fully set forth herein.

168. SMS fraudulently induced 4DD three times: to enter the Interim License Agreement, to extend it by Addendum No. 1, and to extend and expand it by Addendum No. 2.

Each inducement is a separate and independent basis for this count. 4DD pleads each in the alternative, and 4DD is entitled to relief on any one of them whether or not the others are sustained.

### A. The Interim License Agreement

169. On January 9, 2014, in the Interim License Agreement signed by its chief executive officer, Ronald Fishbeck, SMS represented that it sought the license for purposes of working on the development of joint project software in parallel with negotiating a definitive agreement, and for purposes of validating various performance metrics of 4DD technology, and for creating a limited demonstration product to inter-operate with SMS's technology to be displayed at the February 2014 HIMSS conference. The purpose of the agreement was to enable SMS to determine whether it desired to license the 4DD technology for its business purposes. Those statements described SMS's' purpose as it existed when SMS made them, and they were false. On information and belief, SMS then intended to use its access to TETRA and to 4DD's' technical staff to build a data federation capability of its own, and did not intend to confine its use of TETRA to evaluation and to Coordinated Software built on TETRA or to the limited demonstration product for the HIMSS conference.

170. In reliance on those statements, 4DD installed TETRA in SMS's' corporate lab on January 10, 2014; licensed TETRA and 4DD's' software development kit and proprietary API to SMS without charge; gave SMS's' personnel access to 4DD's' support site, documentation, and sample data packages; and sent SMS TETRA's' confidential product roadmap. 4DD's' reliance was reasonable. The statements were made in a signed agreement executed by SMS's' chief executive officer, and they matched the partnership that SMS's' executives had proposed and the Letter of Intent that Fishbeck had signed.

**B. Addendum No. 1**

171. On March 17, 2014, in an addendum signed by its contracts manager, Paul Kodack, SMS represented that it sought to extend its license to allow further validation and testing of 4DD technology by SMS and to continue in good faith to move toward the negotiation of a definitive agreement. That statement was false. On information and belief, SMS did not then intend to use the extension for validation, testing, or good-faith negotiation; it intended to continue gathering TETRA information for SMS's' own product. By then SMS's' architects had asked for "ANYTHING technical" "for an SMS sense," SMS had received TETRA's confidential roadmap, and, three days before the signing, an SMS architect had reported that he was resuming his TETRA research efforts.

172. In reliance on that statement, 4DD extended SMS's' no-fee license through May 31, 2014, continued to support SMS's' use of TETRA and to answer its technical questions, and continued to negotiate a definitive agreement. 4DD's' reliance was reasonable. The statement was made in a signed agreement, and SMS had continued to profess its interest in the partnership.

**C. Addendum No. 2**

173. On June 16, 2014, in Addendum No. 2 signed by Fishbeck, SMS represented that the extension of its license and the addition of TETRA 3.x would allow the parties to continue in good faith to move toward the negotiation of a definitive agreement, and promised that in no event would SMS use 4DD technology to develop a competitive product. The statement and the promise were false when made. On information and belief, SMS's leadership was then developing a competing product, did not intend to negotiate a definitive agreement in good faith, and had no intention of keeping its promise.

174. In reliance on the statement and the promise, 4DD extended SMS's no-fee license through September 1, 2014; left in place the TETRA installations in SMS's' lab, including the installation completed on June 2, 2014; added TETRA 3.x, its newest release, to the license; and continued to work with SMS toward a definitive agreement. 4DD's reliance was reasonable. The promise was a specific written commitment, signed by SMS's' chief executive officer, on the very subject of the competitive use that SMS later made of TETRA.

**D. Allegations Common to Each Inducement**

175. SMS made each statement and promise knowingly and with intent to mislead 4DD, so that 4DD would grant, extend, and expand SMS's' access to TETRA, 4DD's development kit and API, its documentation, and its engineers without charge. Each was material. 4DD granted the license without fee "in consideration for the mutual covenants" in the agreement, and 4DD would not have granted the license, either extension, or TETRA 3.x had it known SMS's true purpose.

176. 4DD was damaged by each inducement. It seeks compensatory damages measured, for each of the three periods, by the license fees SMS avoided for the access it obtained and the value of the installation and support services 4DD provided, and punitive damages for SMS's willful and intentional fraud.

177. This count does not depend on whether 4DD's information was secret. SMS's statements would have been equally false, and 4DD equally harmed by granting free access and free support in reliance on them, if every technical detail of TETRA had been published. 4DD does not seek on this count any recovery measured by the value of a trade secret.

178. This count is timely. 4DD did not discover, and in the exercise of due diligence could not reasonably have discovered, the falsity of SMS's' statements before July 29, 2014;

4DD's earliest notice came in late 2014; and the tolling agreement, effective July 29, 2016, expressly tolls claims for "fraudulent inducement."

## REQUESTED RELIEF

179. WHEREFORE, 4DD respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, and award:

180. Actual damages, including damages measured by the revenue Defendants generated through contracts obtained using 4DD's misappropriated technology and by the value attributed to that technology in SMS's $344 million sale to Lockheed and in Lockheed's approximately $4.6 billion IS&GS transaction with Leidos;

181. Disgorgement of all profits Defendants earned through their improper use of 4DD's intellectual property, including revenues from software licenses, maintenance fees, professional services, and consulting engagements that used TETRA's misappropriated technology;

182. Compensation for the diminution in value of 4DD's business, including lost market opportunities, reduced company valuation, the cost of mitigating the damages Defendants caused, and the loss of 4DD's position as the incumbent data federation solution for the DHMSM program;

183. A permanent injunction prohibiting Defendants from developing, marketing, selling, or licensing any product that incorporates or derives from 4DD's technology, including eHIIP and any derivative products or services, and requiring Defendants to cease using any information developed through their examination, testing, analysis, or use of 4DD's unlawfully acquired confidential information and trade secrets;

184. Enhanced damages to the maximum extent the law allows, pleaded in the alternative and subject to election before judgment: exemplary damages on the trade secret counts, treble damages under 15 U.S.C. § 1117(a) on the reverse passing off count, and punitive damages

at common law on the remaining counts, without duplicative enhanced recovery for the same injury;

185. Attorneys' fees and costs incurred in pursuing this action, as provided by the trade secret statutes and 15 U.S.C. § 1117(a); and

186. A judicial declaration confirming 4DD's ownership of the misappropriated technology and invalidating any patent applications or other intellectual property rights claimed by Defendants that derive from 4DD's technology.

## JURY DEMAND

187. 4DD requests a trial by jury.

November 10, 2026

Respectfully submitted,

/s/ *Tara R. Zurawski*
Tara R. Zurawski
Virginia Bar No. 73602
tzurawski@bdiplaw.com
BUNSOW DE MORY LLP
277 South Washington St., Suite 210, #1088
Alexandria, VA 22314
Telephone: (703) 828-4019
Facsimile: (415) 426-4744

Jeffrey A. Andrews (*pro hac vice* motion forthcoming)
Amy Bergeron (*pro hac vice* motion forthcoming)
Bailey Watkins (*pro hac vice* motion forthcoming)
Spencer Packard (*pro hac vice* motion forthcoming)
**YETTER COLEMAN LLP**
600 Travis Street, Suite 5400
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002
jandrews@yettercoleman.com
abergeron@yettercoleman.com
bwatkins@yettercoleman.com
spackard@yettercoleman.com

***Attorneys for Plaintiff 4DD Holdings, LLC***